SADIE C. LUPTON *vs.* GERTRUDE M. UNDERWOOD.

1. HUSBAND AND WIFE—ALIENATION OF AFFECTIONS—RIGHT TO SUE—STATUTES.

Under 14 *Del. Laws, c.* 550, § 4, providing that any married woman may prosecute and defend suits at law or in equity for the preservation and protection of her property as if unmarried, a married woman may sue in her own name for alienation of the affections of her husband, without alleging that she was still married to the husband, that she was living apart from him, or that defendant knew of the marriage at the time of the grievances complained of.

2. WITNESSES—BEST AND SECONDARY EVIDENCE—EXAMINATION OF WITNESS.

Defendant, having shown to plaintiff, while testifying as a witness, certain letters alleged to have been written by her which had been marked for identification, and which she had identified as in her handwriting, but which had not been introduced in evidence, was not entitled to embody parts of such letters in questions asked of the witness as to whether she did not write such matter to affect her credibility; the letters being the best evidence of their contents and what she wrote.

3. HUSBAND AND WIFE—ALIENATION OF AFFECTIONS—QUESTION FOR JURY.

In an action for alienation of the affections of plaintiff's husband, evidence *held* to require submission of defendant's liability to the jury.

4. EVIDENCE—DOCUMENTS—NOTICE TO PRODUCE.—TIME.

Whether a notice to produce documents not given until the case was on trial was too late depended on the ability of the party notified to produce the document in compliance with the notice.

5. WITNESSES—COMPETENCY—PRIVILEGE.

Plaintiff's counsel participating in the actual trial of the case was privileged from being called by defendant as a witness.

6. WITNESSES—EXAMINATION—LEADING QUESTIONS.

A question asked of the defendant in an action for alienation of affections, whether she wrote certain letters referred to, and, if so, whether with the intention to induce, persuade, or counsel plaintiff's husband to leave her, was objectionable as leading.

7. HUSBAND AND WIFE—ALIENATION OF AFFECTIONS—EVIDENCE—INTENT.

In an action for alienation of the affections of plaintiff's husband, a question asking defendant as a witness to state why she wrote certain letters to plaintiff's husband was admissible on the issue of motive or intent.

8. HUSBAND AND WIFE—WITNESSES—EXAMINATION—LEADING QUESTIONS.

A question asked of defendant as to whether she wrote certain letters in evidence to induce plaintiff's husband to separate from his wife was objectionable as leading, but a subsequent question whether defendant had any other motive in writing the letters than sympathy or friendship for plaintiff's husband was proper.

9. WITNESSES—COMPETENCY—ATTORNEY.

Attorneys whom plaintiff consulted with reference to instituting an action for alienation of affections were disqualified to testify with reference to communications between themselves and plaintiff, though they subsequently declined to represent her.

10. HUSBAND AND WIFE—WITNESSES—COMPETENCY—ATTORNEY.

In an action for alienation of the affections of plaintiff's husband, he having previously testified that he had not talked with defendant's former attorney at his office prior to the trial, the attorney was competent to testify that he was employed by defendant immediately after the suit was brought, and, at her suggestion, sent for plaintiff's husband, and talked with him about the case, but was not entitled to state that in that conversation the husband denied that he ever had any affection for his wife.

11. EVIDENCE—CONFLICTING TESTIMONY—WEIGHT AND CREDIT.

Where testimony is conflicting, the jury should endeavor to reconcile it, if possible, and, if they cannot, should accept that part which they deem worthy of credit and reject the rest, considering all the testimony adduced and the circumstances surrounding the witnesses, their means of information, interest or bias, their manner and apparent truthfulness and fairness in giving their testimony.

12. HUSBAND AND WIFE—ALIENATION OF AFFECTIONS—INJURY TO PROPERTY RIGHTS—ACTION.

Since marriage gives to the wife the same right of conjugal society as it does to the husband, each being entitled to the comfort, companionship, and affection of the other, any interference therewith is a violation, not only of natural right, but also of a property right, for which the wrongdoer is liable in damages.

13. HUSBAND AND WIFE—"ALIENATION OF AFFECTIONS"—NATURE OF ACTION—LOSS OF SERVICE—PECUNIARY LOSS.

The gist of an action for alienation of the affections of plaintiff's husband is the loss of conjugal fellowship and aid of the husband, the loss of consortium being the principal fact, and the alienation of affections, matter of aggravation, it not being necessary to the maintenance of the action that there should be any loss of the husband's service or other pecuniary loss.

14. HUSBAND AND WIFE—ALIENATION OF AFFECTIONS—PRESUMPTIONS.

In an action for alienation of affections, it will be presumed that plaintiff's husband had affection for her up to the time of their separation, in the absence of evidence to the contrary.

15. HUSBAND AND WIFE—ALIENATION OF AFFECTIONS—NATURE OF ACTION.

In an action for alienation of affections, whether plaintiff was justified in leaving her husband is not material, defendant's liability resting on the determination of the question whether plaintiff's loss of consortium was caused by the wrongful acts of the defendant, for it is not essential that defendant's acts should have been the sole cause, if they were the controlling cause.

16. HUSBAND AND WIFE—ALIENATION OF AFFECTIONS—DEFENSE.

Unhappiness, or even separation between plaintiff and her husband, not caused by defendant or the fact that plaintiff's husband had little or no affection for her, was no defense to an action for alienation resulting from unlawful interference between plaintiff and her husband by defendant, but proof of such unhappiness, etc., is admissible in mitigation.

17. HUSBAND AND WIFE—ALIENATION OF AFFECTIONS—DAMAGES.

In a suit for alienation of affections of plaintiff's husband, the measure of her damages is such a sum as would reasonably compensate her for the injury to her feelings and for loss of her husband's comfort, society and support.

18. HUSBAND AND WIFE—ALIENATION OF AFFECTIONS—PUNITIVE DAMAGES.

Where defendant's conduct causing alienation of the affections of plaintiff's husband is wanton and malicious toward plaintiff, plaintiff may recover punitive damages.

19. HUSBAND AND WIFE—ALIENATION OF AFFECTIONS.

In a suit by a wife for alienation of the affections of her husband, a verdict allowing her four thousand dollars was excessive, and should be reduced to two thousand five hundred dollars.

20. EXCEPTIONS, BILL OF—PREPARATION—SIGNING TIME—EXTENSION—STATUTES—COUSTRUCTION.

Rev. Code, c. 113, § 3, as amended by 25 Del. Laws, c. 238, provides that a bill of exceptions must be drawn in form and signed during the term in which the exception is proposed, unless the court shall otherwise order. Held, that the court has power to extend the time for the preparation and signing of a bill of exceptions beyond the term only when the application is made during the term.

(December 9, 1912.)

PENNEWILL, C. J., and BOYCE and RICE, J. J., sitting.
*Daniel O. Hastings* and *Richard S. Rodney* for plaintiff.
*J. Frank Ball* for defendant.
Superior Court, New Castle County, November Term, 1912.

SUMMONS CASE (No. 30, November Term, 1911). Action in
tort by plaintiff to recover damages for the alienation of her hus-
band's affections, alleged to have been occasioned by the defend-
ant, an unmarried woman. The material averments in the decla-
ration and contentions of the parties appear in the charge. Ver-
dict for plaintiff. Motions for a new trial and in arrest of judg-
ment. Upon expression of opinion by the court that the verdict
was excessive, the plaintiff consented to a reduction. The verdict
was reduced, and the motions refused. Thereupon application
was made for enlargement of time for the drawing and signing a
bill of exceptions, none having been made at the trial term.
Denied.

The defendant has, for many years, maintained a boarding-
house on Delaware Avenue, in Wilmington, and Ralph C. Lupton,
husband of the plaintiff, had boarded there for about seven years,
prior to his marriage to the plaintiff, on the eighteenth day of
March, A. D. 1911, when Lupton and his wife immediately occu-
pied an apartment and lived together until the twenty-ninth day
of July following, when a separation occurred and has since con-
tinued. Lupton is and has been for several years a real estate
broker. While boarding with the defendant and after his mar-
riage, he looked after some properties belonging to the defend-
ant, such as collecting rents, attending to repairs and paying
insurance, etc. After his marriage he continued to visit the defend-
ant's home, frequently in the night time, sometimes at the request
of the defendant, at other times at the suggestion of friends, or as
he felt inclined, remaining, at times, as late as eleven or twelve
o'clock. His wife objected to this, and differences, from time to
time, arose between them by reason of such visits and friendship.
Their differences would be adjusted, only to arise again because of
subsequent visits, and because of the manifest jealousies which

existed between the two women and their dislike for each other. With this condition existing, the plaintiff saw the postman deliver a letter to her husband in the handwriting of the defendant, and she asked him what was in the letter, receiving the reply, in effect, you must not inquire of me what the defendant writes to me.    Later the wife observed a letter in the handwriting of the defendant sticking out of the pocket of her husband's coat, which was hanging over the back of a chair in their bedroom.    She took the letter, read it and kept it, as she did seven other letters from time to time, written by the defendant to the plaintiff's husband. These letters made frequent disparaging references to the plaintiff, never, however, by name, but usually referring to plaintiff as "it", "that", or "they".   These letters contained many expressions of friendly interest in Lupton.   Some few sentences, picked here and there, from the letters will show their disparaging character: "Two lives wrecked for one.   I'm sure you are too good for such a life."   "I never can forgive that for doing as they did." "All the good I can say is, I hope and trust it may be short." Mr. —— "when he called, saw you and what you had, knew it was not your choice."   "I'm loyal and I wish you could have heard him.   He asked me when could he see you without seeing her. The face struck him as it did——"   "When that wants to cart you around with her kind, don't go, hear?"   "Do take care of yourself and make it work or send it where it ought to be."   "I'm sure your life will never be happy with that class, you look it, and if you both could settle the matter by having her go to her sisters."   *   *   *   Miss —— "it is the first time she has said to me you looked crestfallen and it made her sad to see you that way"   *   *   *   "said tell me what you think.   I think just as his other friends, the last man on earth to admire a woman like that."   "I hate to know a good man like you having to live and do as you do."   "If they decide to go you'll have money to pay some one to do your work and you'll soon build up your business and be able to live again."   "We all make mistakes sometimes. Don't let it write any notes."   "Don't be in a hurry to get any more things and don't move anything until I see you."   It appears that when Lupton discovered, in the early part of June, that his

letters were missing, he had very little to say to his wife. The wife testified that on Sunday, June the fourth, she said to him, "Won't you please tell me what is the matter with you?" and he replied, "Oh, no, you don't know, do you? You don't know that I've been missing anything out of my pocket?" She evaded his inquiry, and he then said: "he had tried to make a home and thought they would be very happy, but he made a miserable failure and she could just get her lawyer and have everything straightened up; that there was no use trying any more; that they could not get along together." Lupton left the house. Plaintiff took a ride with her brother, returning about six o'clock, finding her husband in the bed. After retiring their difficulties were again discussed. They "made up" the next morning, but Lupton again wanted to know about the letters, the wife did not inform him, but testified that she said: "This woman is trying to separate us, and if she does, I will certainly let everybody know who does it." He said: "Oh, no you won't." Trouble continued from time to time, over the letters, followed by amicable relations, until the twenty-fifth of July when in bed the husband said: "Well, I must know about them." The wife said: "I can't tell you about them." The husband feigned a fit, fell back on the bed, breathed heavily as though he was dying. The wife called to him. Later he arose and said: "Well, I must go if you won't tell me about those letters." The wife refusing to tell him, he packed his suitcase, dressed, took his hat as if to leave, then his wife said: "I will tell you about those letters. I took them." He replied: "Well, I knew you did, but I wanted you to tell me so." They then "made up". The husband then said: "I want you to give me those letters and let me burn them." This was not done. The defendant had given Lupton a scarf pin which, at times, he wore. The wife objected to this and requested him not to wear it but the pin which she had given him, and this he did until the day of the separation, when his wife going to the office in the morning, discovered he was wearing the pin given to him by the defendant. The wife testified that she said to him: "I see you are wearing that pin," and he replied: "You have no business to say what I shall wear and what I shall not, I shall wear this pin

whenever I want to." They quarrelled. The wife was told "she should go, and go right away." She got a case from the safe, went to the apartment, packed her clothing, and awaited the return of her husband in the evening. After some conversation between them, the husband said: "Are you going to give me those letters?" She replied: "Those letters are not in my possession." He said: "You go right straight home to your father where you belong— right straight home." "He went out and slammed the door and I went home." Eight days after this separation Lupton called to see his wife at her father's home. He spent some time there with her. They had a walk together, going to the apartment where he urged his wife to go in and live with him again. She declined. He later wrote her assuring her of his love and beseeching her to come back to him. He kept the apartment open for her return for about two months. He insisted that the letters of the defendant had no alienating influences upon him. Several of these he said he had not read. He insisted that his wife was of a very jealous disposition and that her jealousy was the chief cause of the trouble between them.

When the plaintiff was called to the stand, Ball, counsel for defendant, objected to her testifying in relation to any matter connected with the suit so far as it might in any way bind the defendant for the reason that this action is based upon an act, as amended, (*Sec.* 1, *Chap.* 80, *Vol.* 14) to secure to a married woman money or other property held or acquired by her, living separate from and. not supported by her husband, enabling her to sue therefor in her own name and for her own use.

It was urged that there is no averment that Ralph C. Lupton was, at the time of the commission of the grievances alleged either in the first, second or fifth counts of the declaration, the plaintiff's husband, or that he has continued to be her husband up until the present time, or that she was living separate and apart from him at the time the alleged grievances occurred, or that the defendant knew that the plaintiff and Ralph C. Lupton were husband and wife,—the charge being that the defendant knowingly, wickedly, etc., committed the several grievances complained of.

It was contended that the mere recital in the commencement of the declaration that Gertrude M. Underwood, a *femme sole*, was summoned to answer Sadie C. Lupton, a *femme covert*, living separate from her husband, is sufficient to sustain these counts or to show that the plaintiff was living separate from her husband at the time she brought the suit.

BOYCE, J.:—Under a later act, *Vol.* 14, *Chap.* 550, a married woman may prosecute suits in her own name as if unmarried.

The objection is overruled.

Counsel for defendant in cross examination handed the plaintiff two letters, for the purpose of ascertaining from her whether or not she wrote them to her husband. She having identified the letters as being in her handwriting, and the same having been marked for identification, the witness was asked for the purpose of contradiction: "You have just stated that you had no feeling against Mrs. Underwood prior to your marriage to your husband. After reading these letters which I have handed you, I will now ask you if you did not say to your husband in a letter to him of November 8, 1910, 'I think the best thing would be for girlie to go and take care of Wanca and then she would get him away from that old mischief-maker at 901. I certainly am not pleased with Wanca staying there one bit more than Wanca is pleased·with girlie staying here; but Wanca makes girlie put up with that year after year."

(Objected to by Mr. Hastings, on the ground that it is immaterial whether the plaintiff, prior to her marriage, had ill-feeling against the defendant or not, and is not in cross examination.

*Mr. Ball:* — This witness testified that on one occasion her husband told her that he had been to this defendant's house and she said: "I object. Why don't you take me there?" intimating that she did not know any reason for her husband not taking her to the defendant's house. This was after her marriage, however. This question is asked for the purpose of affecting the credibility of and contradicting the witness, for she in this same letter called the defendant a mischief-maker and objected to Mr. Lupton boarding at the defendant's house or remaining there. She has

Evidence.

testified in chief that she had no feeling against Mrs. Underwood before her marriage.

BOYCE, J.:—Speaking for myself; the letter you refer to is not in evidence. When proved, if admissible in evidence, it will speak for itself. I do not think the contents of the letter should go to the jury except in an orderly way, or that questions should be based upon the contents of the letter even for the purpose of laying grounds for contradiction. Proceeding as you are, Judge Ball, the contents of the letter may be given to the jury although we overrule your questions. I do not think it should be done in that way. I understand your question is based upon the contents of the letter?

*Mr. Ball*:—From a statement in that letter.

BOYCE, J.:—It is the opinion of the court that the objection should be sustained for the reason that the question is directed to an immaterial matter.

*Mr. Ball*:—I would like to ask another question to complete the record.

BOYCE, J.:—Are you going to base your question on the contents of the letter?

*Mr. Ball*:—On the contents of another letter, one that she has identified as having written.

*Mr. Hastings*:—I object to his asking the question upon the very sound ground which the court has suggested. He cannot frame a question, quoting the contents of a letter not yet introduced in evidence, and upon the admissibility of which the court has not yet had an opportunity to pass.

*Mr. Ball*:—I desire to complete the record for any subsequent proceedings.

BOYCE, J.:—You have stated that you again propose to base your question upon the contents of a letter written by the plaintiff to Ralph C. Lupton, who is now, but was not her husband at the time the letter was written.

*Mr. Ball*:—I am not attempting to get the whole letter before the jury. I am only attempting to ask if she did not say at a certain time, to a certain person, something in relation to this defendant. This plaintiff has testified in chief that when she came

home from some place, her husband told her that he had taken Mr. McCorkle out to 901 Delaware Avenue, the home of this defendant, and she said: "I don't like you to take him out there; you never take me out there." She was asked the question why he did not take her out there and she said she did not know. Here is a statement from her that would show the reason why her husband would not take her out there—her own statement why she could not and would not go to that house. I certainly have a right to ask this witness if she did not make that statement upon a time prior to the time of her marriage and prior to the time when she said that he would not take her out and she knew no reason why he should not. The question goes to the prejudice or bias of this witness, and to nothing else.

BOYCE, J.:—You may not frame any question upon the contents of that letter in the manner you have attempted. If the letter is admissible at all for any purpose—there is a regular way to get it in. We sustain the objection.

*Mr. Ball*:—I now ask the permission of the court to present the question, which I had proposed to ask, to the stenographer in order that he may enter it upon the record.

BOYCE, J.:—Are you going to incorporate the contents of the letter in the question?

*Mr. Ball*:—I am going to incorporate only so much of it as I desire to ask, (not stating it to the jury) in order that the record may show the question and that it was ruled out by the court.

*Mr. Hastings*:—I object.

BOYCE, J.:—We think, having inquired of you whether you are going to base your question upon the contents of one of the letters as you did in the former question, which we ruled out, and having your answer in the affirmative, there is sufficient on the record for the Supreme Court, if you should desire to test the soundness of our ruling in that court.

*Mr. Ball*:—Your Honors refuse to permit me to put the question to the stenographer?

BOYCE, J.:—There is now on the record the fact that two letters have been shown to the plaintiff, which she has identified

as letters written by her to Ralph C. Lupton before their marriage. That is true?

*Mr. Ball*:—Two letters marked for identification, yes, sir.

BOYCE, J.:—You have framed a question based upon the contents of one of these letters, not yet in evidence; and we overruled the question. You now seek to frame another question based upon the contents of the other letter, and we decline to permit you to do so. We think you have everything upon the record that is necessary to show the character and extent of our ruling, or to test its correctness elsewhere. We sustain the objection. You may note an exception. (Exception noted.)

*Mr. Ball*:—The ruling of your Honors, I imagine, applies to any statement contained in a certain letter written by this witness, providing the question is based upon the letter?

BOYCE, J.:—What we seek to do is to prevent the contents or part of the contents of any letter going before the jury in the way you have proposed. There is a mode of procedure for your purpose. You must pursue that.

At the conclusion of plaintiff's testimony, Ball, counsel for defendant, moved for a nonsuit, on the ground that the letters written by defendant to plaintiff's husband, and introduced in evidence, taken in connection with the oral testimony, utterly failed to prove that they were the cause of the estrangement between and separation of the plaintiff and her husband; that they showed the only one desire or motive, on the part of the defendant, was to assure Ralph C. Lupton, husband of the plaintiff, that she and all his friends thought as much of him then as they had prior to his marriage, and to encourage him to be a man; not to do a foolish thing; not to injure himself but to live under the circumstances as best he could. Further, there was no evidence in the case that at the time of the separation anything that the defendant had said or done influenced the separation in any way whatsoever, but on the contrary, all matters of difference theretofore existing between the plaintiff and her husband so far as the defendant was concerned had been adjusted; and that there was no evidence to prove that the letters were the controlling cause of the separation.

BOYCE, J.:—We think under the evidence thus far submitted the question at issue is one for the determination of the jury. The motion for nonsuit is, therefore, denied.

*Ball*, counsel for defendant, then served Mr. Hastings, one of the plaintiff's counsel, with the following notice:

"I hereby notify you to produce and demand that you do produce forthwith the letter bearing date August 7, 1911, which you state in your letter of September 20, 1911, to Mr. Ralph C. Lupton his wife had left with you, as I desire to use the same as evidence in the case of Sadie C. Lupton vs. Gertrude M. Underwood now being on trial in the Superior Court of the State of Delaware, in and for New Castle County"; and asked for the production of the letter referred to.

Counsel for plaintiff contended that the notice, having just been delivered at the trial was too late, citing *Carson v. Johns*, (163 Sept. T. 1904) unreported, and the English case of *Holt v. Miers*, 9 *Carr. & Payne*, *p*. —.

BOYCE, J.:—The lateness of the notice to produce is not necessarily controlling.

*Mr. Rodney*:—Do I understand the court has ordered the production of the paper on five minutes' notice?

BOYCE, J.:—The question presented is whether you are in a position to produce.

*Mr. Rodney*:—The objection to produce is upon the lateness in making the demand.

BOYCE, J.:—Your present ability to respond to the notice is the test of the sufficiency of the notice.   If you have the letter present, you must produce it.

*Mr. Rodney*:—I am absolutely without knowledge whether Mr. Hastings has the letter or not.   I desire to object to the notice itself.

BOYCE, J.:—We overrule the objection.

*Mr. Rodney*:—We have the letter.

BOYCE, J.:—Then the notice is in time.

The letter was, thereupon, produced and handed to Mr. Ball.

*Mr. Ball*:—It is now in evidence?

Testimony.

BOYCE, J.:—The letter having been produced in response to a notice therefor, and inspected by counsel calling for it, it proves itself, if there be no other legal objection.

*Mr. Hastings*:—It must be proved that this letter was written by the husband and received by the plaintiff before it can be admitted in evidence.

BOYCE, J.:—We overrule the objections made. The letter is in evidence.

*Mr. Ball*:—Mr. Hastings, will you take the witness stand?

*Mr. Hastings*:—No.

BOYCE, J.:—We cannot permit Mr. Hastings to be called.

The defendant being called, was asked by her counsel: "Did you write those letters (referring to the letters as having been written by the defendant to plaintiff's husband) for the purpose or with the intention to induce or to persuade, or to counsel Ralph C. Lupton to leave his wife?"

(Objected to by counsel for plaintiff as leading, also on the ground that the defendant could not give explanation, in her defense, why she wrote the letters.)

*Ball*, for defendant, contended that it was competent for the defendant to negative the intent charged if she could, and to state to the jury whether she had such intent as charged when she wrote the letters.

*Mr. Hastings*:—The question is leading, and besides a stranger cannot justify for any interference in a case like this under a plea of not guilty. Malice is presumed from these letters. The only way the defendant could testify in reference to writing these letters, would be in mitigation of damages, and not in bar of the action. 21 *Cyc. p.* 1619; *Hartpence v. Rogers*, 143 *Mo.* 623, 45 *S. W.* 650; *Trumbell v. Trumbell*, 98 *N. W.* 683.

*Ball*, in reply, cited *Prettyman v. Williamson*, 1 *Penn.* 224; *Rath v. Rath*, 89 *N. W.* 612.

BOYCE, J.:—We sustain the objection to the question because of its leading character.

Q. State to the court and the jury why you wrote those letters that have been testified to here that you did write. (Objected to by counsel for plaintiff, on the ground as before stated.)

BOYCE, J.:—It does not appear to the court that the purpose of the question is to justify but rather to show motive or intent. We overrule the objection.

A.   Out of sympathy and friendhip for Mr. Lupton.

Q.   Did you or not write any of the letters that have been offered in evidence, for the purpose of inducing Mr. Lupton to separate himself from his wife?

(Objected to by counsel for plaintiff as leading.)

BOYCE, J.:—The objection is sustained.

Q.   Did you have any other motive in writing these letters than the one you have stated,—that you did it out of sympathy and frienship for Mr. Lupton?

(Objected to by counsel for plaintiff as leading.)

BOYCE, J.:—The objection is overruled.

A.   I did not.

*Ball*, for defendant, called David T. Marvel, Esquire, an attorney-at-law, subpoenaed to bring with him a letter written to him by the plaintiff, dated August 23, 1911, who after testifying that he had made search for the letter but could not find it, —was asked: "Will you look at the paper I hand you, and tell me if that is a copy of that letter?"

(This was objected to by Mr. Hastings, who examined the witness as follows): "Did Mrs. Lupton, the plaintiff, come to consult with you after she and her husband had separated?"

A.   She did.

Q.   I will ask you whether you afterwards told her that under the circumstances you did not desire to represent her?

A.   I did.

Q.   Was it after the date of the letter you have referred to (July 29, 1911) or before that you told her that you could not represent her in this matter?

A.   I am unable to fix the date.   I was advising both parties, trying to patch up their trouble, and when there was about to be a law suit, I refused to represent either one.

(Mr. Hastings here objected to the witness answering the question or any question relative to the matter in issue, upon the

Evidence.

ground that whatever communication was made to him by the plaintiff was privileged.)

By JUDGE BOYCE:

Q. Can you tell by reading the letter and observing its contents, whether the plaintiff did consult you before you received it?

A. Yes, sir; she consulted me before that.

Q. Did she consult you professionally with reference to this case?

A. They had asked me to represent them. They had both spoken to me. I knew it was coming to litigation and I had advised them on the law.

BOYCE, J.:—We think the communication is privileged and sustain the objection.

*Mr. Marvel* was recalled for plaintiff in rebuttal, and asked: "Did you or not advise Mr. Lupton when he consulted you, that it would be necessary for him to invite his wife back in order to relieve him of her support?"

(Objected to by Mr. Ball, as a privileged communication.)

BOYCE, J.:—We sustain the objection.

*Herbert H. Ward*, Esquire, an attorney-at-law, was also called for plaintiff in rebuttal, and, after stating that he formerly represented Mrs. Underwood, the defendant, was asked: "In preparing this case, did you or not talk to Ralph C. Lupton in your office?"

(Objected to by counsel for defendant, who interrogated the witness as follows):

Q. You represented Mrs. Underwood up to a certain time?

A. Immediately after the suit was brought I became her counsel.

Q. And did she suggest to you certain witnesses that you might see and that you ought to see in preparing her case?

A. When she came to consult with me I talked the matter over with her, but did not go into the preparation of her case until after the declaration was filed. Then I had a further conservation with her and I then got the correct view of her case, and at her suggestion I called upon certain witnesses, and at her suggestion I sent for Ralph C. Lupton.

*Mr. Ball* thereupon objected to the witness testifying to anything that occurred in his office, as a privileged communication.

*Mr. Hastings* stated that he had asked the question for the purpose of contradicting Lupton, he having laid the ground therefor when Lupton was on the stand.

BOYCE, J.:—We will permit this question to be answered.

A. I did.

Q. During one of the conversations had with Ralph C. Lupton, in your office, relative to this case, did he not tell you that he never had affection for his wife, or words to that effect?

(Objected to by counsel for defendant as privileged.)

BOYCE, J.:—It occurs to the court that while this question may not strictly fall within the class of questions that are priviliged, yet to permit it to be answered would be against the spirit and policy of former decisions by this court. We, therefore, sustain the objection.

## PLAINTIFF'S PRAYERS.

A husband is entitled to the society, comfort, fellowship, assistance and services of his wife, and whoever, by the alienation of her affections, deprives him thereof, commits a wrong against the husband for which he is liable to respond in damages. *Prettyman v. Williamson*, 1 *Penn.* 224 (236).

The wife has a similar property right in her husband's consortium, enforceable in this state in an action at law brought by her. *Eliason v. Draper*, 2 *Boyce* 1, 77 (*Del.*) *Atl.* 572.

No stranger has the right to intermeddle with the domestic and marital relations of husband and wife, and if one voluntarily does so, he or she is answerable for the consequences. *Hartpence v. Rodgers*, 143 *Mo.* 623, 45 *S. W.* 650; *Modisell v. McPike*, 74 *Mo.* 636; *Barnes v. Allen*, 30 *Barb.* 663.

If the acts and conduct of the defendant were the controlling cause of the wrong or injury complained of, and without which it would not have occurred, the action may be maintained, although there were other causes contributing thereto. *Pretty-*

Prayers.

*man v. Williamson (supra);  Hadley v. Heywood,* 121 *Mass.* 236;
*Fratini v. Caslini,* 66 *Vt.* 273, 29 *Atl.* 252;  *Dallas v. Sellers,* 17 *Ind.*
479;  *Sutherland on Damages, Vol.* 4, *p.* 3771.

The law presumes the husband had affection for his wife,
but if this be rebutted, such rebuttal is no bar to the action for
two reasons: (1) because even if the husband had no affection
for his wife, another person has no right to interfere to cut off all·
chances of its springing up in the future, and (2) because the
alienation or loss of affection is not the substantive cause of action
but a matter of aggravation of damages, the gist of the action
being the loss of the consortium, that is, loss of aid, support, pro-
tection, comfort and society of her husband.  *Beach v. Brown,*43
*L. R. A.* 114;  *Prettyman v. Williamson (supra);  Fratini v. Caslini,*
66 *Vt.* 273, 29 *Atl.* 252;  *Nichols v. Nichols,* 48 *S. W.* 947.

The alienation of the affections of the husband is often the
means by which his separation from his wife is effected; that,
however, is not essential to her cause of action.  *Sutherland on
Damages, Vol.* 4, *p.* 3771;  *Nichols v. Nichols,* 147 *Mo.* 387, 401,
48 *S. W.* 947.

The measure of damages is such a sum as the jury may be-
lieve from the evidence will reasonably compensate the plaintiff
for the deprivation and loss of her husband's affection, society,
comfort, companionship, protection, support and aid; as well as
the destruction of her happiness, the breaking up of her home,
and the mental pain she has suffered.  *Prettyman v. Williamson,*
*(supra);  Nichols v. Nichols,* 48 *S. W.* 947.

If the defendant wilfully and maliciously committed the
injury or wrong complained of, the jury may in addition to com-
pensatory damages award the plaintiff such damages as they may
consider proper as a punishment to the defendant and an example
to others.  *Prettyman v. Williamson, (supra).*


DEFENDANT'S PRAYERS.

The burden is upon the plaintiff to satisfy the jury by a pre-
ponderance of the evidence that the charges contained in the
declaration are true.

The jury cannot assume the charges against the defendant to be true.  *Waldron v. Waldron*, 45 *Fed.* 316.

The jury cannot find a verdict in favor of the plaintiff on the suspicion that the acts charged against the defendant caused the alienation of the husband's affections.

The jury must find that the defendant caused the separation and alienation of the affections of the husband of the plaintiff, and that it was done intentionally and knowingly by some of the causes alleged in the declaration.  *Nevins v. Nevins*, 75 *Pac.* 492;  68 *Kan.* 410;  *Waldron v. Waldron*, 45 *Fed.* 315.

The defendant cannot legally be made to answer on account of the shortcomings and misconduct, if any exist, of the husband not caused by direct and active interference of the defendant.

If the defendant wrote the letters complained of and thereby the affections of the husband of the plaintiff were alienated, this will not warrant a verdict for the plaintiff, unless the jury be satisfied by a preponderance of the evidence that the defendant wrote them wrongfully, wickedly and unjustly, and that they were the controlling cause of the alienation.

It is necessary for the jury to ascertain first, whether the affections of the plaintiff's husband were really alienated, and second, if so, what was the controlling cause thereof.

If the plaintiff by leaving her home and refusing to return when requested to do so by her husband thereby of her own volition sacrificed her husband's affections and deprived herself of the comfort, fellowship, society, aid and assistance of her husband, the verdict should be for the defendant.

The mere saying to a wife by her husband "go home to your people" is not enough to warrant her to separate herself from him and refuse to return to him when so requested by him.  And if the plaintiff separated herself from her husband because during a quarrel he told her to go home to her people, and if she refused to return when requested to do so by her husband, the plaintiff cannot recover.

BOYCE, J., charging the jury:

Gentlemen of the jury:—This action was brought by Sadie C. Lupton, the plaintiff and wife of Ralph C. Lupton, against

Gertrude M. Underwood, an unmarried woman, the defendant, to recover damages for an injury to the right of property of her, the plaintiff, in the affections, society, and support of her husband, alleged to have been occasioned by the defendant.

It is not denied that the plaintiff is now, and was the wife of Ralph C. Lupton at the time of the bringing of this action, and has been since March 18, A. D. 1911; and that they have lived separate and apart since July the twenty-ninth, the same year.

The plaintiff, in her declaration, charges, in substance, that the defendant, on certain days, therein mentioned, in the months of April and May, A. D. 1911, and on divers other days between those dates, respectively, and the commencement of this action, wrongfully, wickedly, and unjustly (1) wrote letters to plaintiff's husband, and thereby counselled, induced, and prevailed upon her husband to disregard the duty which he owed to her, and thereby his affection for her was alienated and destroyed, and by means thereof she has wholly lost and been deprived of the comfort, fellowship, society, aid, and assistance of her husband in her domestic affairs which she ought to have had and otherwise might and would have had; (2) that the defendant, in like manner, became the companion of the plaintiff's husband at the home of the defendant in this city to the loss and deprivation of the plaintiff; (3) that the defendant in like manner, enticed, persuaded, and prevailed upon the plaintiff's husband to separate himself from her, by means of which, and on no other account, she lost and was deprived of her husband's affection, assistance, and rights of consortium; (4) that the defendant, in like manner, enticed, persuaded, and prevailed upon the plaintiff's husband to frequently meet her, the defendant, at her said home, to the loss and deprivation of the plaintiff; and (5) that the defendant, in like manner, counselled, induced, and persuaded the plaintiff's husband to violate his marital obligations and to cease loving the plaintiff, his wife, whereby his affection for her was destroyed to the loss and deprivation of the plaintiff. It is then charged that by means of the several grievances the happiness of the plaintiff has been destroyed, her home has been broken up, and that

she has been caused great mental pain and suffering, and otherwise greatly injured.

The defendant has pleaded not guilty by which she absolutely denies the commission of the several complaints of the plaintiff.

The defendant admits writing the several letters to plaintiff's husband, introduced in evidence by the plaintiff.

It is claimed for the defendant that she had known the plaintiff's husband, upwards of ten years; that he had boarded with her some seven or eight years prior to and up to the time of his marriage with the plaintiff; and that he had for a long time attended to business matters for the defendant. It is admitted that the plaintiff's husband visited the home of the defendant after the marriage—at times, it is claimed, at the request of others, and, at other times, for business reasons; and it is insisted that the relations between him and the defendant were proper, at all times. The defendant denies that the said letters were written for the purpose of alienating or destroying the affections of plaintiff's husband for her, or for the purpose of inducing a separation between them. And it is urged that the plaintiff voluntarily separated herself from her husband; and that, after so doing, he besought her in person and by correspondence to resume marital relations with him. This is, at least, a partial summary of the contentions of the parties. Your recollection of the testimony will enable you to supply any omissions.

[11] We are not permitted to make any comment upon the testimony; the jury being made the exclusive judges of the credibility of the witnesses and of the weight and value of their testimony. Your duty is to carefully consider all the testimony, and to return a verdict in accordance with the preponderance of the evidence, considered in connection with our charge to you upon the law. When the testimony is conflicting, as in this case, the jury should endeavor to reconcile it. If they cannot do so, they should accept that part of it, which they deem worthy of credit and reject that which they deem unworthy of credit, taking into consideration all the testimony adduced and the circumstances surrounding the witnesses respectively, their means of information

and opportunity of knowing the facts of which they have testified, their interest or bias, if any, and their manner and apparent truthfulness and fairness in giving their testimony.

[12] Under the statutes of this state removing the disability, at common law, of a married woman to sue in respect to her property in her own name alone, a married woman may maintain an action for alienation of her husband's affections. Marriage gives to the wife the same right of conjugal society as it does to the husband. Each is entitled to the comfort, companionship and affection of the other. The rights of the one and the obligations of the other spring from the marriage relation.

Any interference with these rights, whether of the one or the other—particularly by a stranger—is a violation, not only of natural right, but also of a legal right arising out of the marriage relation. *Bennett v. Bennett*, 116 *N. Y.* 584, 23 *N. E.* 17, 6 *L. R. A.* 553.

Whoever, therefore, by the alienation of the affections of a wife's husband, deprives her of his affections, commits a wrong against her property rights for which such wrongdoer is liable to respond in damages. *Eliason v. Draper*, 2 *Boyce* 1, 77 *Atl.* 572.

[13] The basis of the action is the loss of conjugal fellowship, society and aid of the husband. The actionable consequences of the injury of the wrong, whenever committed, is the loss of consortium, and the alienation of affections is a matter of aggravation. And it is not essential, therefore, to the maintenance of the action that there should be any loss of the husband's services, or any pecuniary loss whatever.

[14] In the consideration of this case, you may assume that the plaintiff's husband, who lived and co-habited with his wife from their marriage to the time of their separation, had, during that time, an affection for his wife, unless you find testimony rebutting the presumption.

[15] The issue which you are called upon to decide is not whether the plaintiff was justified in leaving her husband but whether the defendant was the cause of the alienation and loss of consortium. It must appear by a preponderance of the evidence that the alienation and loss of consortium were wrongfully, un-

justly and effectively caused by the defendant by the means and as charged in the plaintiff's declaration in order to warrant a verdict for the plaintiff. It is not necessary to entitle the plaintiff to a recovery that it should appear that the defendant's conduct was the sole cause thereof. It is sufficient if the defendant's conduct was the controlling cause. [16] If the defendant's conduct was effective in causing the injury complained of, any unhappiness or even separation between the plaintiff and her husband, not caused by the defendant, would not justify or excuse the defendant for any unlawful interference between the plaintiff and her husband; for even if it should appear that the husband had little or no affection for his wife, another person has no right to interfere to cut off all chance of its springing up in the future. If the alleged conduct of the defendant was not the controlling cause of the alienation, the plaintiff cannot recover.

Any unhappiness between the plaintiff and her husband, while living together, not being induced by the defendant, would not, in itself, constitute a bar to the plaintiff's action, but would go in mitigation or reduction of damages. In cases of this character, the extent of the actual injury to the plaintiff will of course depend upon the prior relations between the plaintiff and her husband. Evidence in mitigation or reduction of damages will, therefore, be received, which tends to show that the plaintiff has in fact suffered less injury than would otherwise be a probable inference from the act complained of. It is proper therefore, for you to consider, in mitigation of damages, but not in bar of the action, evidence, if any, which shows any unhappy relations between the wife and husband, not caused by the defendant, any want of affection for each other, and the fact that they are living apart, together with the circumstances under which the separation occurred. These and like matters are proper for your consideration, in mitigation of damages, to determine whether on account of such relation, the wife lost much or little by reason of the alleged acts and conduct of the defendant, if you find the defendant committed them and that they induced the injury complained of. *Prettyman v. Williamson*, 1 *Penn.* 224, 39 *Atl.* 731.

[17] If you find from the evidence that the defendant wrong-

Verdict—Motion for New Trial.

fully and unjustly, by any, or all of the acts complained of, had a controlling influence in alienating the affections of the plaintiff's husband, your verdict should be for the plaintiff; and the measure of damages would be such as you believe would reasonably compensate the plaintiff for the injury to her feelings; for the loss of her husband's comfort and society; and for the loss of his support.

[18]　If you find from the evidence that the defendant's conduct was effective in causing the alienation of the affections of plaintiff's husband and was wanton and malicious toward the plaintiff, you may, in such event, in your discretion, award exemplary or punitive damages, in addition to compensatory damages. But in order to warrant the awarding of exemplary damages, you must be clearly satisfied by the evidence that the defendant's conduct was wanton and malicious.

If you find from the evidence that plaintiff's husband alienated his affections from plaintiff without the influence of the alleged misconduct and interference on the part of the defendant, or that the alienation of his affections was the result of some other cause, over which the defendant did not exercise an effective influence, your verdict should be for the defendant.

In conclusion, your verdict should be for that party in whose favor the evidence preponderates.

Verdict for plaintiff.

[19]　At the same term motions for a new trial and in arrest of judgment were made, which were continued to the January Term, when after argument and an expression of opinion by the court that the verdict rendered was excessive, the plaintiff consented to a reduction of the verdict to $2,500. An order was accordingly made by the court, that the verdict should be so reduced, and the motions for a new trial and in arrest of judgment were refused. After such refusal the defendant made application for an enlargement of time for the drawing and signing a bill of exceptions till the first day of the March Term. There was no exception taken or proposed subsequent to the trial term. Neither was there any application made for an enlargement of time for drawing and signing a bill of exceptions till the January Term. The

plaintiff resists the defendant's application on two grounds, viz.:—

1. Because the court has no authority to grant the application.

2. Because, even if it has the power, the enlargement of the time asked for would nevertheless be in the sound discretion of the court, and in the exercise of such discretion the application could not be granted.

PENNEWILL, C. J., after stating the motions and contentions as above, delivered the opinion of the court:

There are raised in the present case two questions: the first involving the power of the court and the second involving the discretion of the court.

[20]    The determination of the first question depends entirely upon the construction the court shall place upon a statute of this state found in the *Revised Code* at 851, as amended by *Chapter 238*, *Volume 25*, *Laws of Delaware*, which provides that, "the bill of exceptions must be drawn in form and signed during the term in which the exception is proposed, unless the court shall otherwise order." The concluding words—"unless the court shall otherwise order," constitute the amendment, and were inserted in the original act to take the place of the following words: "unless the parties otherwise agree with the assent of the court."

It is admitted by the defendant that under the original act the application now made could not be granted, but it is insisted that under the act as amended it may be, because the amendment, when fairly construed, means that the court may make an order enlarging the time for drawing and signing exceptions, not only during the term at which they were proposed, but at a subsequent term until final judgment is entered in the case. It is claimed by the defendant that it would be unreasonable to hold that the party must incur the expense and trouble of preparing his exceptions and having them signed before he can possibly know whether the judgment will be against him or not, because he cannot, until there is a decision on his motion for a new trial, know whether he will sue out his writ of error or not.

The plaintiff replies that the drawing and signing of the exceptions is an entirely different matter from suing out the writ of error; that while the latter must follow the entry of final judg-

ment, the former may precede it; and that the requirement of the statute does not necessarily subject the party to trouble and expense because if the exceptions are not drawn and signed during the term when prepared it entails no hardship to make application at such term for an enlargement of time. It is insisted that such an application is in no wise dependent upon the issuance of the writ of error. The plaintiff contends that the effect of the amendment was, not to enlarge the time when the exception might be drawn and signed, but solely to give the court the power to extend the time without agreement of counsel, because prior to the amendment if counsel did not agree the court could not adjourn without giving reasonable time for preparing the bill of exceptions, and it was to obviate that difficulty and embarrassment that the act was amended. The court are of the opinion that this contention is sound and reasonable. It is admitted by the defendant, as we have stated, that prior to the amendment of the statute such an application as she now makes could not have been granted. We think that the only additional authority conferred upon the court by the amendment is to enable them to extend the time without agreement of counsel. The statute contemplated, after amendment, as before, that the exceptions should be drawn and signed during the term at which they were proposed unless an enlargement of the time was then asked for and granted. If counsel sees fit to move for a new trial, or for an arrest of judgment at the trial term, and such motion is continued, the requirement that he shall at the same term apply for an extension of the time for signing his bill of exceptions to the next term, entails no expense and imposes no hardship. He is not obliged to procure a copy of the record, draw out his exceptions or have them signed, before final judgment is entered in the case, but only to ask the court, before the adjournment of the term at which the exception was proposed, for an enlargement of the time during which his exceptions may be signed. This is, we think, a fair and reasonable construction of the statute based upon its language, and the manifest intent of the amendment, which was simply and solely to authorize the court to enlarge the time without any agreement of counsel.

The application of the defendant is refused.