THE STATE OF DELAWARE, upon the relation of the State Highway Department, Plaintiff, v. THE IMPROVED PARCEL OF LAND, known as Nos. 123 and 128 Logan Street, with the buildings thereon erected, situate in the City of Wilmington, County of New Castle and State of Delaware, RALPH BELL and GERTRUDE BELL, his wife; CHARLES ABRAMS and FRANCES ABRAMS, his wife; PEOPLES BANK & TRUST COMPANY, a Delaware corporation; and Unknown Owners, Defendants.

(*February* 27, 1963.)

LYNCH, J., sitting.

*Daniel L. Hermann* and *William D. Bailey, Jr.*, for Plaintiff.

*Louis J. Finger* and *Jacob Balick* for Defendants.

Superior Court for New Castle County, No. 982, Civil Action, 1962.

LYNCH, J.:

 We must at all times recognize that condemnation proceedings in this state are governed by statute and the several provisions of the statute must be considered in determining any question of evidence arising in the course of trial, and by the same token our statute, 10 *Del. C.* Ch. 61, may make a big difference in the evaluation of an authority or precedent cited from some other state.

For example, defendants place great reliance in a question, hereafter considered, on the case of *In re Blackwell's Island Bridge Approach*, 198 N. Y. 84, 91 N. E. 278, 41 L. R. A., N. S., 411 (Ct. of A., 1910). When consideration is given of the nature of condemnation proceedings under the New York law, see *In re Huie*, 2 N. Y. 2d 168, 157 N. Y. S. 2d 957, 139 N. E. 2d 140 (1956—N. Y. Ct. of A.), it will be seen 157 N. Y. S. 2d 960, 139 N. E. 2d 141 that the position of "commissioners of appraisers [under the New York system] is a somewhat unique one. * * * They are given wide latitude in arriving at their determination * * * In addition to hearing the proofs of the parties, they are required[1] to view the real estate. * * * Appraisers are, in general, 'untrammeled by technical rules of evidence', * * * and may use their own judgment and experience as well as information obtained from a personal inspection of the property * * *.

"The commissioners also have wide discretion as to the factors upon which they may base their determination of value. * * * [quoting from a prior opinion in which the Court of Appeals had reviewed what elements the commissioners of appraisal could consider, it was said] 'Omision of an attempt to enumerate all [elements of value] is of no consequence

---

[1]Compare Title 10 *Del. C.* § 6108(d), making the view discretionary "[and] for the purpose of better understanding the evidence". INDICTMENT AND INFORMATION.

here. It would be a difficult and unsatisfactory venture. No single element standing alone is decisive'. * * *" The new York Court of Appeals in the *Huie* Case set forth the "power of the courts to review an award [and stated it] is strictly limited, and every intendment is in favor of the action of the commission. * * * The courts will reject a determination * * * only for irregularity in the proceedings, or if based on an erroneous principle of law, * * * or, if it 'shocks not only one's sense of justice, but one's conscience'. * * *"

Comparison of such a system with the provisions of Title 10, § 6108, will readily demonstrate the caution one must follow in accepting decisions of the Courts of New York.

In the course of the trial the defendants offered evidence of negotiations between defendants and one Appleby concerning the rental to be paid under a then proposed lease of the premises. I cannot overlook the fact that Mr. Appleby characterized the discussions between the parties as "horse trading"; furthermore, notwithstanding there may have been some accord in their discussions as to the price per square foot for the property to be covered by the lease, I must accept the fact that Mr. Appleby failed to follow up with the suggestion of one of the defendants—Mr. Bell—that he proceed to prepare a lease with the terms as he wanted them, inferring no finality to the discussion.

Objection was made to this offer of evidence and the plaintiff primarily argued that the Court should reject the proffered evidence because it was an offer. From my examination of the authorities I am not prepared to wholly reject offers as evidence of value. I am of opinion that offers may be utilized as evidence of value, as was brought out in the case of *City of Chicago v. Lehmann*, 262 Ill. 468, 104 N. E. 829, 831. In that case real estate agents had testified they had received "bona fide" offers and such offers were offered to show the market then existing for the property which was the subject of that condemnation proceeding. That is brought

out in an examination of the case of *City of Chicago v. Blanton*, 15 Ill. 2d 198, 245, 154 N. E. 2d 242, where the Illinois Supreme Court pointed out that the trial court has discretion which it should exercise in determining the admissibility of such evidence.

Here I rule only that the evidence of the discussions did not reach that dignity which would cause me to be of the opinion, in the exercise of my discretion, that there had been a "bona fide" offer of rental values. There were too many places in the testimony where there were doubtful factors, arising from a consideration of all the testimony on the discussions, and which affected my judgment of the admissibility of the evidence of the so-called "offer" as testified to by Mr. Bell and by Mr. Appleby.

I would be very loathe to take a definite and inflexible position that all offers are inadmissible or, for that matter, admissible; it will all depend on the recognition of the parties making and accepting the offers and there must be enough safeguard evidence to prevent collateral inquiries from being injected into a case which might lead the commissioners astray and cause them to be confused rather than enlightened by the evidence of the offer.

This necessarily leads to the next ruling I am called upon to make and that involves the subject of what discretion, if any, a court trying a condemnation case has in the reception of the evidence proffered by the parties. In *Searl v. School District No. 2*, 133 U. S. 553, 562, 10 S. Ct. 374, 377, 33 L. Ed. 740, the Supreme Court in an unanimous opinion said in a condemnation case: (10 S. Ct. 377)

"The circuit court was * * * dealing * * * with a proceeding in the exercise of the right of eminent domain. That right is the offspring of political necessity, and is inseparable from sovereignty, unless denied to it by its fundamental law. It cannot be exercised except upon condition that just compen-

sation shall be made to the owner, and it is the duty of the state, in the conduct of the inquest by which the compensation is ascertained, to see that it is just, not merely to the individual whose property is taken, but to the public which is to pay for it. * * *"

While the late Mr. Justice Cardoza was a member of the New York Court of Appeals, he cited the *Searl* Case, in New York, *O. & W. R. Co. v. Livingston*, 238 N. Y. 300, 144 N. E. 589, 591, 34 A. L. R. 1078 (1924) saying:

"No formula will be adequate unless its breadth of view and flexibility of adaptation are fitted and proportioned to the scheme and purpose of the inquest. The problem is one of justice between the individual proprietor on the one hand and on the other hand the sovereign, or the representative of the sovereign power."

At a later point in his opinion in the case Mr. Justice Brandeis observed (*Id.*):

"* * * Just compensation is determined by 'equitable principles' * * * and its measure varies with the facts."

In a number of cases the statement can be found that "[t]he admission of evidence touching the value of property appropriated in condemnation cases must be left largely to the discretion of the trial judge." See *Union Electric Light & Power Co. v. Snyder Estate Co.*, 65 F. 2d 297, 304 (C. C. A. 8, 1933); *United States v. Wise*, 131 F. 2d 851, 852 (C. C. A. 4, 1942); *United States v. Becktold Co.*, 129 F. 2d 473, 479 (C. C. A. 8, 1942), citing other cases, and *United States v. Toronto, Hamilton & Buffalo Nav. Co.*, 338 U. S. 396, 70 S. Ct. 217, 94 L. Ed. 195 and particularly concurring opinion of Mr. Justice Frankfurter.

In using the term "discretion" I mean—

"The discretion vested in the court is not an arbitrary or capricious prerogative of the court but must mean the exer-

cise of the mind upon the given facts both for and against the application. It has been said that discretion in a legal sense is 'the responsible exercise of official conscience on all the facts of a particular situation in the light of the purpose for which the power exists."

This was the language used by Judge Rodney in *Reeves v. Penna. R. R. Co.*, 9 F. R. D. 487, 489 (D. C.); see also the definition used by former President Judge Richards in *Caras v. Delaware Liquor Commission*, 8 Terry 268, 90 A. 2d 492, 494 (Super. Ct., 1952); and what was said of discretion by the Court in *Peterson v. John Hancock Mut. Life Ins. Co.*, 116 F. 2d 148, 151 (C. C. A. 8, 1940); and in *Baldwin v. Ewing*, 69 Idaho . . ., 204 P. 2d 430, 432 (1949).

Defendants produced Daniel Koffler, a well known and recognized consulting engineer, and proposed through him to show the cost of reproduction and/or replacement of the structure on the premises, less depreciation, as an element of value which the defendants contended should be considered by the commission.

The plaintiff, through counsel, objected to the competency of Mr. Koffler to give such testimony, contending that a builder rather than an engineer or an architect was the only type of witness who could be qualified to give testimony on the cost of reproducing or replacing structures, such as is to be found on the property in this case.

The Court is of opinion that engineers as well as architects, estimators and builders are competent to testify on building costs; that it may be a matter of the weight to be accorded one over the other. In any event, engineers of the qualifications of Mr. Koffler, experienced architects, as well as builders and estimators, are all competent to testify on building costs.

Plaintiff further contended that evidence of "reproduction or replacement costs" was not admissible in any

case as an element going to prove market value of property which is subject to condemnation unless and until the owner of the property makes a showing that such evidence is a necessary factor in demonstrating "fair market value". In fairness to defendants it must be recognized that Mr. Koffler had been called "out of order" in order to make certain that his testimony would be available. It is doubted, however, that so far as the record shows, or possibly would ever show, it would have been proper to receive evidence of reproduction or replacement costs, less depreciation, in the case at bar in light of all the facts.

The parties have filed somewhat extensive briefs and supplements thereto. Defendants cite *Brennan v. Black*, 34 Del. Ch. 380, 104 A. 2d 777 (1954) as applicable on evidence of reproduction or replacement costs. In that case the Court was considering a method of assessment that had been used by the County Board of Assessment in assessing property in New Castle County. It is to be noted that the statute, 9 *Del. C.* § 8301, provides that all real estate has to be assessed "and in making such assessment the Boards shall value and assess all property * * * all additions, new buildings, and improvements * * *." This Court knows of no other method for assessing buildings and improvements and to bring the properties within the "standard of assessment" prescribed by statute, Title 9 *Del. C.* § 8307, i.e. "at its true value in money" which in my opinion is just another way of saying "market value", except by use of "reproduction" costs.

A careful and intensive investigation of all the authorities and as many cases as could be read in a period of about five days has convinced the Court that evidence of cost of reproduction and/or replacement, less depreciation, is not admissible, in the absence of a showing of the necessity for the use of such evidence, as in the case of churches, unique buildings and structures or where there is no available evidence of a ready market value, see *United States v. Beck-*

*told Co., supra,* or where there is no evidence of rental value which will aid in showing the market value of the property subject to the condemnation proceeding. This is covered in a very illuminating annotation appearing in 172 A. L. R. 236 at 244.

That annotation refers to the *Blackwell's Island Bridge Approach* Case, referred to on page 479 hereof and on which defendants place great reliance. Some analysis of that case and the background of the New York cases is necessary.

In the Appellate Division, *In re Blackwell's Island Bridge Approach*, 118 App. Div. 272, 103 N. Y. S. 441, the Court had said "testimony as to how much the market value of the lot is enhanced by the building standing thereon" was competent, but that the structural value of the building was not competent. That had been the ruling of the same Court of Appeals in a decision handed down a short time before, in the unanimous opinion reported in *Village of St. Johnsville v. Smith*, 184 N. Y. 341, 77 N. E. 617, 620, 5 L. R. A., N. S., 922. There the Court had said:

"* * * it must be distinctly understood that the measure of such compensation is neither the costs of improvements nor their value or the value of their use to the village. The true inquiry is how much do the improvements placed upon the property enhance the value of the appellant's land."

The *Blackwell's Island Bridge Approach* Case was a 4 to 3 opinion; it involved tenement houses where there was ample evidence of sales and actual rental received by the owner.

The dissent was quite caustic in its criticism of the majority opinion,—particularly in light of the fact that between the time the *Village of St. Johnsville* Case had been decided and the *Blackwell's Island Bridge Approach* Case had come up for determination the Court of Appeals in the *Matter of Simmons*, 195 N. Y. 573, 88 N. E. 1132, decided by the same

personnel of the New York Court of Appeals on May 11, 1909—only 10 months before the opinion in the *Blackwell's Island Bridge Approach* Case,— had unanimously followed the rule in the *St. Johnsville* Case. The dissent had pointed out (91 N. E. at page 282)—

"* * * 'The buildings put upon the land are simply adjuncts to the freehold. They add to its value, and are properly included in an appraisal of it, but it is the value of the land and structures which is to be determined, and not the cost of them. For these reasons it has been held that the testimony of the structural value of the buildings is not competent in proceedings of this kind.' * * *"

At a later point the dissent stated (*Id.*)—

"*It may be assumed, without deciding, that evidence of structural value should be admitted in some peculiar and unusual cases where other and better evidence cannot be obtained, and that it is admissible to test the information and knowledge of a person presented as an expert upon the question of market value, but evidence of structral value, except as stated, should be excluded, as it does not in itself show the amount, even in part, of just compensation, and it tends to an unsafe and improper estimate of damages. The discussion of the St. Johnsville Case in the prevailing opinion substan-, tially admits that evidence of structural value of the improvements upon the lands in that case would be inadmissible, and what is there said tends to emphasize how improper and unsafe evidence of structural value is in all condemnation proceedings where general evidence of market value can be obtained.*" (Emphasis supplied)

In light of the prior decisions of the New York Court of Appeals, as stated, it is difficult to comprehend the precise purpose of the *Blackwell's Island Bridge Approach* Case, except that the Court had had a change in point of view and under the prevailing wide discretion, vested in the commis-

sioners of appraisal, as referred to in the *Huie* Case, *supra,* the case means only that the cost of reproduction, less depreciation, theory of valuation is a proper basis for a commission of appraisal to make a finding of value under the New York cases. It can't be read further than that and certainly in light of the many decisions that hold that such theory is usable only "where general evidence of market value" cannot be obtained, the case cannot be read to have any other meaning. It is not persuasive to me, and I decline to regard it otherwise than stated above, as representing New York law.

I think that the prevailing rule as to the use of evidence of reproduction costs of a building or other improvement, with proper allowances for depreciation is as stated in the annotation appearing in 172 A. L. R. 236 at 244 *et seq.* and in volume 5, *Nichols on Eminent Domain,* 3rd Ed., §§ 20.2[1] [2] [3] and 20.3. The adoption of such a rule will more likely lead to awards which are, in the language of the Supreme Court in *Searl v. School District No. 2, supra* 133 U. S. at page 562, 10 S. Ct. at page 377, "just, not merely to the individual whose property is taken, but to the public which is to pay for it".

Undoubtedly, facts can and will be developed in cases which will show a definite need to resort to this type of evidence; until such a showing is made that "general evidence of market value [cannot] be obtained" our Courts should be reluctant to permit commissions, appointed under our statute, to consider evidence which will not result in a finding of an award representing "fair market value". In every case the commission should be charged to the same effect as is found in *United States v. Becktold Co.,* 4 Cir., 129 F. 2d 473 at 479 and along the same lines as was given in the instructions approved in *United States v. Wise,* 4 Cir., 131 F. 2d 851, 853.

It would not be proper for me to conclude my

discussion of the reproduction costs, less depreciation, without pointing out that the owner will have to show that it would be possible under the law to *reproduce* the structure in light of now or then prevailing legal restructions. There was discussion in this case, in the course of presentation of evidence, that Mr. Appleby contemplated using the premises as a "plating" manufactory. Some considerable doubt exists whether under the Department of Public Works Regulations pertaining to what can be discharged in sewers without previous treatment, a "plating" manufactory could be installed. No showing was made that that had been considered. Then, too, under applicable state and municipal laws and regulations, suitable permits would have had to issue to construct and operate a slaughter house, which was the type of use that the structure presently on the premises had had for many years. There had been some evidence offered of possible use of the structure for other purposes but it is clear this would have entailed conversion costs, and defendants argued that "replacement" costs were as admissible as "reproduction" costs. I am not convinced that this is so; I am very much per suaded by the logical approach and discussion found in *Council Grove O. C. & O. Ry. Co. v. Center*, 42 Kan. 438, 22 P. 574 (1889). The Supreme Court of Louisiana in *State v. Chadick*, 226 La. 367, 76 So. 2d 398, 400 (1954) also rejected "replacements costs of improvements" stating that they "could not be accepted as the actual value of the improvements". I am at loss to understand defendants' citation of *Ortego v. State*, 130 So. 2d 432, in light of the fact that the evidence was held insufficient to support landowner's claim and the result of the case apparently has no relationship to "replacement" as contrasted with "reproduction". There may be an instance in some later case where "replacement" and "reproduction" can be used interchangeably. Since, however, the entire purport of Ch. 61 of Title 10 *Del. C.* seems to be that the valuation is of the "real estate"— singly and not the

aggregate value of the land plus the value of the property—I believe that "reproduction" of the structure and the enhancing effect, as to market value, of land with the structure, necessarily mean that the Court should limit the evidence, where reproduction costs are applicable, to "reproduction" rather than "replacement".

The condemnation proceedings contemplated by our statute makes no provision or contains no language which would indicate any intent on the part of the General Assembly to evaluate the land and the improvements separately and then aggregate these two elements as representative of the market value of the real estate which is subject to the condemnation proceedings. I make no complete ruling on this, leaving to another time and under a different showing of facts if there is a reason for making an award representing the market value of real estate, which is subject to the condemnation proceedings. I may say in passing that my general ruling as to use of evidence of reproduction costs, less depreciation, finds support in the pre-trial ruling of now Justice Terry, when he was President Judge of this Court, and sat in the case of *State v. Delaware Barrell & Drum Co., Inc.*, No. 1670 Civil Action, 1961 (unreported).

When counsel for the plaintiff was cross-examining Mr. Bell, one of the defendants, who appeared as a witness for the defendants, he sought to elicit from Mr. Bell the price paid by Messrs. Bell and Abrams for the purchase of the property, which is the subject of this condemnation proceeding. Defendants' counsel objected, primarily on the basis that since Messrs. Bell and Abrams had purchased this property from a Receiver of the company that formerly owned the property, such purchase and sale did not represent the type of purchase—sale which is required in these cases; they argued it was a "forced" sale.

Evidence was taken of the sale efforts by the Receiver and counsel for the defendants sought to make much of the

fact that this Receiver had sold the property 42 days after the receivership came into being. Ths Receiver testified that he had contacted the various persons who were engaged in the type of business formerly conducted on the premises and by an advertisment in a trade magazine circulated among persons engaged in such business. Concededly there was no general publication and no public auction; in every sense it seems to have been a negotiated sale. Mr. Abrams lives in Philadelphia and he learned of the property being for sale and he interested Mr. Bell, a resident of Wilmington, who thereafter negotiated with the Receiver for the purchase of the property.

I rule that plaintiff's counsel could ask Mr. Bell the price paid by Messrs. Bell and Abrams for the entire premises, particularly since (1) this was in course of cross-examination; (2) because the time of the sale—something less than 3 years from the agreed date of taking—was comparatively close enough to throw light on the market value of the premises, see *Wilmington Housing Authority v. Harris*, 8 Terry 469, 476, 93 A. 2d 518 (Super. Ct. 1952); and (3) because the showing of the circumstances surrounding the sale tend to indicate that Messrs. Bell and Abrams were ready buyers and although the Receiver was anxious to dispose of the property to save money in any effort to conserve it,— particularly against the damage from vandalism which seemed prevalent in the neighborhood—there was no compulsion on him to sell. The price paid was in excess of the appraisal and the sale of the premises was only approved after notice by the Receiver to the creditors and a hearing before a Vice-Chancellor. I feel a given assurance that the Vice Chancellor would not have approved the sale had it been indicated by anyone that the consideration paid by Messrs. Bell and Abrams was inadequate.

It is true, as stated in Volume 5, *Nichols on Eminent Domain*, in § 21.32, doubt exists as to the price paid on "forced sales", page 464, but the author points out (*Id.*)

that consideration is given to a sale in legal proceedings "if bidding was free and open". From the facts related by the Receiver—and undenied by defendants—Messrs. Bell and Abrams sought out the Receiver and there were negotiations that led ultimately to the Receiver accepting the price offered by Messrs. Bell and Abrams. See generally *In re Chrystie St., Etc., In City of New York*, 236 App. Div. 321, 258, N. Y. S. 243, 249 (1932) and *Hickey v. United States*, 3 Cir., 208 F. 2d 269, 276 (1954), where the Court of Appeals, 3d Circuit, permitted evidence of circumstances of a judicial sale to be considered by a jury under an appropriate charge; and see *In re Ohio Turnpike Commission v. Ellis*, 164 Ohio St. 377, 131 N. E. 2d 397, 403 (1955), where the Supreme Court of Ohio indicated it was discretionary for the trial court to have received evidence of the circumstances of a sale conducted by County Commissioners of land that subsequently became the subject of a condemnation proceeding.

The "settlement sheets" memorializing the closing of the Receiver's sale to Messrs. Bell and Abrams were identified by counsel for the plaintiff and offered in evidence. Defendants' counsel objected. It is true, as argued by counsel for the defendants, that the Receiver sold Messrs. Bell and Abrams real estate, machinery therein, and the trucks used in connection with the operation of business. These latter items were sold by Messrs. Bell and Abrams almost immediately after their acquisition and one of the settlement sheets shows that Mr. Bell had attributed a given figure as representing the value of the real estate, including the structures thereon. Counsel for the defendants argues that this was for tax purposes. Mr. Bell did not say so, although he probably would have done so. It appears to me that this settlement sheet with this marking of the value of real estate is in the nature of a declaration against interest, such as was tended by plaintiff. On this theory it would have been admissible. 18 *Am. Jur.*, § 349.