THE STATE OF DELAWARE, ex rel. The State Highway Department, Plaintiff, v. 62.96247 ACRES OF LAND, more or less, in New Castle Hundred, New Castle County and State of Delaware, SUSAN P. BISSELL and Unknown Owners, Defendants.

*(August* 8, 1963.)

(Withdrawn, corrected, revised and refiled
September 17, 1963.)

LYNCH, J., sitting.

*Daniel L. Herrmann* and *William D. Bailey, Jr.,* for
the State of Delaware.

*William Poole, Frank O'Donnell* and *Charles S.
Crompton, Jr.* (of Berl, Potter and Anderson), *Joseph J.
Longbardi, Jr.,* with them on the brief; *John S. Walker*
and *Frank J. Miller; John Van Brunt, Jr.* (of Killoran
and Van Brunt); *Clement C. Wood* (of Allmond and
Wood), and *Abraham Hoffman* for Defendant Land-
owners.

Superior Court for New Castle County, No. 947,
Civil Action, 1961 (Consolidated Cases).

LYNCH, Judge.

At the trial of the separate issue in these consolidated
cases under Rules 16 and 42(b), Rules of the Superior
Court, concerning the applicability of the so-called "Miller
Rule", handed down in *United States v. Miller,* 317 U.S.
369, 63 S.Ct. 276, 87 L.Ed. 336 (1943) in land condemna-
tion cases, defendant landowners called as a witness an

expert land appraiser, a registered M.A.I.[1], associated with a Wilmington real estate office. The State stipulated as to his qualifications. The witness testified that he was familiar with the general real estate market in the area surrounding the Delaware Turnpike, at which point the State objected to the witness testifying further, on the ground that the State had theretofore employed him as an expert appraiser to evaluate a number of properties along and in the area of the Turnpike in the years between 1957 and 1961; that the State had received oral and written reports from this witness; and that he has been present at and participated in conferences with other appraisers, held at the office of the attorney for the State, in the preparation for trial in the cases now on trial before the Court.

The defendants had called other real estate appraisers—not Members of the Appraisal Institute—to testify on the very same issues being considered by the Court[2]. They later called other witnesses of like capability and they also testified on the same issue.

It is to be observed that this Court has, for many years, permitted numerous real estate brokers, agents

---

[1]Member, Appraisal Institute.

[2]In light of some contentions advanced by the defendant owners (page 22 of their opening brief), pointing out "there are only six M.A.I. members in this area", it may be there is some reason of necessity for the testimony of this witness and thus a reason for my determining if the State should be permitted to claim privilege as to this witness's testifying. I entertain strong doubts as to the soundness of such an argument. I consider it desirable to quote from portions of the *voir dire* examination of the witness, particularly the questions propounded by the Court and the witness's answers in response.

"BY THE COURT:

"Q  Mr. Witness, let me ask you a preliminary question. * * * So far as the character and excellence of a study, evaluation and appraisal reports—one made by an M.A.I. and one made by one who is not a member thereof, or not so accredited—is there anything that you could say that would give the Court any assistance in how to evaluate one report against the other?

and salesmen, who have shown themselves to be familiar with the facts of the real estate market, and demonstrating experience and knowledge of how to make appraisals, to qualify and testify as "expert real estate appraisers"—qualified and capable to express opinions on real estate matters. There are many such persons in this community—some of whom have given their testimony in this very proceeding and in other condemnation cases; I regard many of them most highly, since in my judgment, they have demonstrated their competence to make acceptable appraisals; hence any argument based on "necessity" has, in my opinion, no real merit, and will be disregarded.

The State's contention is as follows:

"The transcript * * * discloses that the witness's status is an appraiser-consultant, previously employed by the State, and thus gives rise to a privilege which the State now claims prevents his being used as a witness for the property owners as part of their case.

---

Note 2 continued—

"A   I think the best thing for me to say is that an M.A.I. would certainly have the training, experience, education and background to know the proper way to relate comparables, and to estimate values.

"Q   And to know what factors to consider?

"A   Yes, sir.

"Q   That is the way that you would say that an appraisal made by an M.A.I. is of—I don't say better or greater value,—but that is how you would evaluate one against the other?

"A   The non-M.A.I., it is possible that they would know how, but it is also possible that they would not know how.

"Q   You have given me the answer. That is all I want to know. I just thought that you men who are in the same profession could help me understand and comprehend just how you, who are in the profession of making appraisals, would consider one against the other. You have given me the answer. * * *. All I want to know is, from a man who is in the position or in the profession, how he would look upon it?

"A   As a matter of explanation, if you care to hear it, I have taken over 40 hours of examination, besides courses and demonstrations to the National Institute in order to show my competency in order to obtain this designation."

"The witness has testified that he has been engaged since 1958 in making appraisals for the State Highway Department of 6 to 12 properties along the alignment of the present Turnpike. He has done reappraisals of such properties, on behalf of the State, * * *. He has made no such appraisals for any private owner[3] nor does it appear that he has engaged in any sale or other transaction involving the subject properties.

"In addition to such appraisals made for the State, the witness, as a State employed real estate consultant, has participated with other appraisal experts in a series of conferences, since 1961, with the State's legal counsel— on the very subject of these proceedings, i.e., the applicability and effect of the Rule of the Miller case to the properties taken for the present Turnpike."

On the other hand, the defendants say:

"The defendants' offer of proof by the witness would be to ask him if he is familiar with the over-all real estate market in the area for the years in question, if a general increase in value in real estate in the area developed between the years 1957 to 1962, and, if such increase in value has occurred, whether, in the witness's opinion, such general increase was influenced, caused, or affected by the activities of the State Highway Department during this period. As counsel for defendant clearly stated, no questions have been asked * * * of the witness concerning any appraisals, reports, or communications between the witness and the State, its agencies or its attorn-

---

[3]The witness testified that in addition to making appraisals along the Turnpike alignment for the State, he had also performed the same function for certain private land owners of other properties, located in the area of the project for the same purpose as is shown in his reports to the State, but not along the alignment of the Turnpike.

eys;[4] or any such transactions between the witness and private land owners in the area. Defendant's evidence from this witness will include no questioning of the witness about such transactions or reports, no request to produce them, refer to them, refresh himself from them or in any way rely on them."[5]

It is highly desirable that the respective positions of counsel be stated and all facts assembled and considered, bearing on the right of the State to assert and insist on the claim of privilege. The defendants argue:

"The State apparently claims that even under such a limited offer the testimony of the witness is inadmissible on the ground that he was at one time employed by the State in his expert capacity and is, therefore, barred from giving any testimony in the litigation unless called by the State."

To clarify and define the respective positions of the parties, the Court had the oral argument stenographically reported by a Court Reporter and then transcribed. At the opening of the oral argument the Court inquired:

"* * * the first thing that I feel must be shown on the record is—had the witness, during the period that he was engaged in making appraisals of the properties

---

[4]The witness stated that "my purpose of being here and my understanding of being here is not to divulge privileged information or confidential information * * *."

[5]The witness testified he made appraisals for the State as well as for private clients. Seemingly the witness has copies of all appraisal reports he has made of properties in the area available to him at his office. He stated "it would take hours to separate them all". The reports for the State were made on at least two occasions; he "began approximately [in] May of 1958" and again in 1960; reappraisals were made in 1961 and 1962 "of properties that had been made by [witness] * * * in prior years". All were made for the State. The witness stated his appraisals were of properties "Basically in the alignment for the State Highway Department" and none for private clients.

as the State's consultant or expert, made reports either written or oral, and if so, is the material sought to be elicited by the question to which the objection is made * * * a part of, encompassed within, or the subject of the oral or written reports made by the witness as a State consultant or expert in connection with the State's presentation of this case?"

Continuing in his inquiries, the Court asked:

"* * * I use the following terminology, not in anywise to cast any aspersions, but because the use of the vernacular sometimes aids to bring out things a bit more graphically,—was Mr. Walker seeking to 'pick the brains' of the witness—to get from the witness, by his testimony under this issue at this hearing, the same material, same information as was encompassed within the appraisals, reappraisals, or the oral or written reports as he made them to the State, or embraced within the discussions with counsel?"

The attorney for the State addressed himself to this question in this language:

"I came into the picture as attorney for the Highway Department in July of 1958. I believe that the witness participated in the appraisal of properties up and down this very alignment as of 1958. Those reports, many of them were in writing—I don't know how many, but I know there were many written reports of 1958 appraisals of these very properties made for the State.

"I also tell the Court that in April of 1962, I wrote the opinion letter which Your Honor knows all about now, and it is in evidence in this case as to the Miller Rule. And as of about that time, the witness was engaged in making reappraisals of these very same properties.

"Now, the reason for the reappraisals being made
* * * was that * * * since the bonds had been sold
for the turnpike and the road was now in movement; it
was necessary to get reappraisals, and so the witness be-
gan reappraisals of the same properties and upon the
writing of my opinion of April of 1962, this witness and
other appraisers of properties involved along this align-
ment, [all of whom had been employed by the State be-
fore then] met with me on various occasions. I wanted
to talk with [them] about the Miller Rule, as persons
who had a personal knowledge as appraisers of the prop-
erties involved. And we had a series of meetings and
conferences and luncheon meetings to discuss my opinion
and its effect upon these properties and the significance
of the Miller Rule on the whole picture. And this witness
participated in those several meetings.

"Now, as late as a month ago, and I say within the
last 30 or 60 days, this witness met with me—

"THE COURT: On this same subject?

"MR. HERRMANN: Same subject; making an oral
report to me. Mr. Hanby was there I think, as was Mr.
Keene [Chief Right of Way Agent], and at that time I
received information, advice, opinion, a report—but oral—
from this witness and others as to whether the claimed
increase in values of these various properties resulted
from the taking and from the work relating to the public
project; the very question, the ultimate question that the
offer of proof talks about. They were in my office; they
discussed with me the ethics of this witness * * * be-
coming [a witness for] the other side of this case * * *.
He was asking me, however, whether he might accept
employment by, and be engaged by the other side of this
case. I won't go into any further discussions except to
point out that this ethical question was raised with me,

and, therefore, I say to the Court that there are written appraisals and written reappraisals and oral reports on the question that is before this Court."

The Court inquired, in substance, of counsel for the defendant landowners if they challenged Judge Herrmann's statement, as given above, and they all stated they did not; they agreed with what had been said regarding the background of this witness, his knowledge and the other factors mentioned by Judge Herrmann in giving the witness's position in the case; it was agreed that the witness had not expressed himself in writing on the ultimate question the Court has been called upon to determine, although Judge Herrmann had stated he had given "oral reports" on the question.

Judge Herrmann made a further statement:

"At this meeting within the last 30 or 60 days, when the witness was in my office those present were discussing with me, and giving me their advice and their opinion on this very question; that is to say, in the enhancement and market value, the increment arising from the project itself. Whether you call this a report, whether you call this advice and opinion, or discussion; I am not sure; but this is what happened.

"THE COURT: Well, do you find and does either side contend that if it is a written report, this rule of privilege is to be decided one way, and if the reports or statements are oral, the rule is another way?

"MR. POOLE: Yes, but definitely, the cases so outline.

"THE COURT: My problem has been—I haven't had the chance to study your cases, and that's what I will do; I want to be sure I get your divergent views.

"MR. POOLE: A lot of the cases that are cited in our briefs, I know Your Honor will study them, make the differences between written communications and reports and testimony, and I just want to make it quite clear that is the very heart of one of our arguments. I just can't agree with Judge Herrmann one bit on that point.

"THE COURT: I am well aware of the fact that you contend that * * * the fact that there was a discussion orally between counsel and the witness, as I read your briefs is not within the privilege. I haven't studied the cases. I read your briefs and will listen here today to your arguments, and note you contend that such discussions do not come within the privilege where the written reports would; isn't that your position?

"MR. POOLE: That is one of our positions. That's right.

 *  *  *  *  *  *

"THE COURT: All right, we have the starting point."

So the issue has been joined—presenting the question of privilege as claimed by the plaintiff for determination.

■ It is axiomatic—a principle of long standing—that a person who has knowledge of facts, as contrasted with opinions, and is equipped to be a witness, and who is called to testify in litigation must answer inquiries, except on matters that are privileged. It is stated in Wigmore on Evidence, Vol. 8, p. 70, § 2192 (McNaughton Rev.1961)[6]:

"* * * that the public * * * has a right to every

---

[6]All references to Wigmore are to this revision.

man's evidence. * * * we start with the primary assumption that there is a general duty to give what testimony one is capable of giving and that any exemptions which may exist are distinctly exceptional, being so many derogations from a positive general rule."
See also 97 C.J.S. Witnesses §§ 2-4; and compare Vol. 8 Wigmore, §§ 2196, 2285 et seq. and 97 C.J.S. Witnesses §§ 252, 276, 289.

Wigmore at § 2285, page 527, says:

"* * *, four fundamental conditions are recognized as necessary to the establishment of a privilege against the disclosure of communications:

"(1)   The communications must originate in a confidence that they will not be disclosed.

"(2)   This element of confidentiality must be essential to the full and satisfactory maintenance of the relation between the parties.

"(3)   The relation must be one which in the opinion of the community ought to be sedulously fostered.

"(4)   The injury that would inure to the relation by the disclosure of the communication must be greater than the benefit thereby gained for the correct disposal of litigation.

"Only if these four conditions are present should a privilege be recognized.

"That they are present in most of the recognized privileges is plain enough; and the absence of one or more of them serves to explain why certain privileges have failed to obtain the recognition sometimes demanded for them. In the privilege for communications between attorney and client, for example, all four are present, the

only condition open to any dispute being the fourth. * * * ."

A study of Chapter 82 of Volume 8, Wigmore on Evidence shows clearly that it is not only communications between attorney and client which are privileged; the privilege can and does go further, as will appear.

It is my purpose in this case to determine if the claim of privilege, as made here, can and should be upheld and applied as contended by the plaintiff.

■ There are many exclusionary rules of evidence that are intended to withhold evidence which is regarded as unreliable or regarded as prejudicial or misleading, but rules of privileged communications have no such purpose. Such rules of privilege preclude the consideration of competent evidence which could aid in determining the outcome of a case, and privilege in no way can be justified as a means of promoting a fair settlement of disputes.

Privileges have been traced to the Roman law, where the basis for exclusion was the general moral duty not to violate the underlying fidelity upon which the protected relation was built.[7]

At early common law, the obligations of honor among

---

[7] Radin, The Privilege of Confidential Communication Between Lawyer and Client, 16 Calif.L.Rev. 487 (1928).

It was written long ago, Gospel of St. Matthew, Chap. 6, 24th verse: "No man can serve two masters; for either he will hate the one, and love the other; or else he will hold to the one, and despise the other. * * *"

In the course of this hearing allusions have been made to memberships on the Ethics Committees of the Real Estate Boards and of the Professional Societies of Appraisers. I wonder if they have adopted any ethical standards that they can relate to this matter? What is the position of such committees on a situation such as is presented here? If they have not acted in such a situation it is strongly suggested they consider doing so. Much has been said publicly of late about "duality or conflict of interest"; in what respect would and does this differ from the position of the witness whose right to testify in this case has been challenged?

gentlemen were advanced as the basis for maintaining silence[8], however, in 1776 the House of Lords made it clear that the communicant was the holder of the privilege and the policy was to protect his interests.[9] Some courts have justified a particular privilege in the interest of justice[10], public health[11] or some similar goal[12].

Thus, the duty of the confidant of nondisclosure of confidential communications is imposed to protect the reliance interest of the communicant, with an assent of the community. This reliance interest is protected because such protection will encourage certain communications. Encouraging these communications is desirable because the communications are necessary for the maintenance of certain relationships. It is socially desirable to foster the protected relationships because other beneficial results are achieved, such as the promotion of jus-

---

[8] 8 Wigmore, Evidence, § 2286 (3d. Ed. 1940).

[9] Duchess of Kingston's Case, 20 How.St.Tr. 586; Notable British Trial Series (Melville ed. 1927); see also *City and County of San Francisco v. Superior Court*, 37 Cal.2d 227, 231 P.2d 26, 25 A.L.R.2d 1418 (1951) (to preclude the humiliation of the patient that might follow disclosure of his ailments); *Woernley v. Electromatic Typewriters*, 271 N.Y. 228, 2 N.E.2d 638 (1936) (to prevent the physician from disclosing information which might result in humiliation, embarrassment, or disgrace to the patient); *Annesley v. Earl of Anglesea*, vc How.St.Tr. 1139, 1225 (1743) (inability of client to carry on his own legal business).

[10] *Anderson v. Bank of British Columbia*, 2 Ch.D. 644 (1876); *Greenough v. Gaskell*, 1 Myl. & K. 98, 103 (1833) ("But it is out of regard to the interests of justice, which cannot be upholden, and to the administration of justice, which cannot go on without the aid of men skilled in jurisprudence * * *.").

[11] "To. open the door to the disclosure of secrets revealed on the sickbed, or when consulting a physician, would destroy confidence between the physician and the patient, and, it is easy to see, might tend very much to prevent the advantages and benefits which flow from this confidential relationship." *Edington v. Mutual Life Ins. Co.*, 67 N.Y. 185, 194 (1976).

[12] "* * * the reason of the rule for excluding the confidences between husband and wife * * * is found to rest in that public policy that seeks to preserve inviolate the peace, good order, and limitless confidence between the heads of the family circle so necessary to every well-ordered civilized society." *Mercer v. State*, 40 Fla. 216, 227, 24 So. 154, 157. (1898).

tice, public health and social stability. These goals are promoted in furtherance of a well-organized, peaceful society, which in turn is considered necessary for human survival.

The case which best illustrates why the Court considers the claim of privilege is justified and should be upheld is *City and County of San Francisco v. Superior Court*, 37 Cal.2d 227, 231 P.2d 26, 30 (1951) where it was ruled that a report of a physician of the physical condition of an injured person, given to a lawyer who engaged the physician, representing the injured person, was ruled privileged, even though the patient could not have claimed the physician-patient privilege.

The case shows that the lawyer had engaged the physician to examine the injured client and to advise the lawyer in the conduct of the trial of the case.

The California Supreme Court in applying the claim of attorney-client privilege said (231 P.2d 30):

"The privilege is given on grounds of public policy in the belief that the benefits derived therefrom justify the risk that unjust decisions may sometimes result from the suppression of relevant evidence. *Adequate legal representation in the ascertainment and enforcement of rights or the prosecution or defense of litigation compels a full disclosure of the facts by the client to his attorney.* 'Unless he makes known to the lawyer all the facts, the advice which follows will be useless, if not misleading; the lawsuit will be conducted along improper lines, the trial will be full of surprises, much useless litigation may result. Thirdly, unless the client knows that his lawyer cannot be compelled to reveal what is told him, the client will suppress what he thinks to be unfavorable facts.' * * * Given the privilege, a client may make such a

disclosure without fear that his attorney may be forced to reveal the information confided to him. '[T]he absence of the privilege would convert the attorney habitually and inevitably into a mere informer for the benefit of the opponent.' 8 Wigmore, supra, § 2380a, p. 813." (Emphasis supplied)

Continuing the California Supreme Court ruled (Id.):

"*The privilege embraces not only oral or written statements but actions, signs, or other means of communicating information by a client to his attorney.* * * * '(A)lmost any act, done by the client in the sight of the attorney and during the consultation, may conceivably be done by the client as the subject of a communication, and *the only question will be whether, in the circumstances of the case, it was intended to be done as such.* The client, supposedly, may make a specimen of his handwriting for the attorney's information, or may exhibit an identifying scar, or may show a secret token. *If any of these acts are done as part of a communication to the attorney, and if further the communication is intended to be confidential * * *, the privilege comes into play.*' 8 Wigmore, supra, § 2306, p. 590." (Emphasis supplied)

In determining if the physician-patient privilege could be invoked, the California Supreme Court held (231 P.2d at p. 31):

"* * * Had Hession himself described his condition to his attorneys there could be no doubt that the communication would be privileged and that neither the attorney nor Hession could be compelled to reveal it, * * *; see, 8 Wigmore, supra, § 2324, p. 628. It is no less the client's communication to the attorney when it is given by the client to an agent for transmission to the attorney, and *it is immaterial whether the agent is the agent of the*

*attorney, the client, or both. '(T)he client's freedom of communication requires a liberty of employing other means than his own personal action.* The privilege of confidence would be a vain one unless its exercise could be thus delegated. *A communication, then, by any form of agency employed or set in motion by the client is within the privilege'."* (Emphasis supplied)

At a later point the California Supreme Court ruled (231 P.2d 31):

"* * * Thus, *when communication by a client to his attorney regarding his physical or mental condition requires the assistance of a physician to interpret the client's condition to the attorney, the client may submit to an examination by the physician without fear that the latter will be compelled to reveal the information disclosed.* * * *" (Emphasis supplied)

See 8 Wigmore, §§ 2317, 2318 and cases cited in footnote 5 on pages 625-627.

■ Plaintiff contends that the witness· acquired his testimonial desirability as a State appraisal expert; that he subsequently communicated this to the State Highway Department's attorney by way of the written and the oral reports he made, and the matters were covered in the conferences referred to in Judge Herrmann's statements, see supra, page 802, et seq.; that all of this is embraced within the attorney-client privilege, citing *Wise v. Western Union Telegraph Co.,* 6 W.W.Harr. 456, 178 A. 640, 644 (Super.Ct.1935), the unreported holding in *State v. 89.4242 Acres,* Civil Action No. 793, 1962, New Castle County, and *Lupton v. Underwood,* 3 Boyce 519, 531, 85 A. 965, 970 (Super.Ct.1912).

Defendants, on the other hand, argue that the privilege dealt with in the Wise case and relied upon by the

State, is not to be recognized (1) because the witness did not claim privilege; (2) that the privilege has not been extended to matters beyond pre-trial discovery, citing *Winter v. Pennsylvania Railroad Co.*, 6 Terry 108, 68 A.2d 513 (Super.Ct.1949); and (3) that defendants' proposed interrogation of the witness will not intrude on matters of fact or opinion embraced in the witness's reports to the State in his capacity as a State Expert. They further contend that while the privilege may apply to the written reports, it does not apply to the oral reports or to the matters covered in the conferences and involving the advices counsel for the State received orally at meetings attended by the witness in the preparation of the case for trial.

Before proceeding to consider these arguments the Court has some preliminary observations to make. Some reference has heretofore been made to the basis for the privilege, supra, p. 806, where the article in 16 Calif.L. Rev. 487 was cited. In that article Professor Radin had this to say (pages 487-489):

"* * * The attorney * * * for many centuries was very much the obedient servant of the family or person * * * whose affairs he directed. Yet if the pundonor was adequate to exempt an advocate or barrister from being asked questions touching his dignity, there was at least an equally old and powerful feeling that required a similar reticence on the part of attorney or solicitor. A servant must keep his mater's secrets and however honored and influential a servant, an attorney was for a long time definitely in that class and kept something of that standing, although, to be sure, he was never a 'servant' in the specific sense which the English law attached to that term.

*"The duty of loyalty on the part of servants was an*

*obvious and general one, based upon normal human feeling, and scarcely needed authority to establish it. But there was authority as well.* It was one of the commion places of the Roman law that a servant—who was, to be sure, a slave—might not give testimony against his master. That was part of the inadmissibility in general of the testimonium domesticum, the testimony which worked against the strongest instincts of ancient society. The slave was incompetent as a witness, not so much because a master had the right not to be betrayed by his slave, but because a slave was essentially part of his family and the relationship of all members of the family was based on mutual fidelity. It seems that originally—as late perhaps as the middle of the second century A.D.—a slave might testify for his master, but shortly after that time, the rule was established that either for or against his master, his testimony was inadmissible. It was the same for parents and children, patrons and freedmen. There was, besides, a long list of persons who in criminal cases could not by the lex Iulia be compelled to give testimony, although apparently they might, if they so chose.

"Advocates equally from very ancient times could not be called as witnesses against their clients while the case was in progress. Cicero in prosecuting the Roman governor of Sicily regrets that he cannot summon the latter's patronus, Hortensius (Cic. in Verr. Act ii, 8, 24), and the matter had received a statutory regulation in the Acilian law on bribery of 123 B.C. But just as in the case of the testimonium domesticum, this incapacity was extended afterward. By later imperial mandate, advocates and attorneys (agents) were made completely incompetent as witnesses in the case in which they acted.

"Although the basis of the exclusion was the general moral duty not to violate the underlying fides on which

the family was built, the rationalization of the rule was made to rest on the doctrine that the testimony was valueless either for or against a litigant. The theory seems to have been that if a member of a family testified in behalf of another—or an advocate on behalf of his client—he could not be believed because he had a strong motive for misstatement. If he violated group solidarity by testifying against him, he was a disreputable person and unworthy of belief."

At a later point, Professor Radin pointed out (p. 489):

"That the Roman precedent was the origin of the English rule as far as attorneys are concerned, cannot be proved. It may have been, and it may have had some influence even on the barrister's obligation—although the conventional pundonor of gentlemen seems adequately to account for the latter. But from the eighteenth century on, the duty of loyalty conceived in terms of the attorney's duty to his employer, has overwhelmed the notion of the gentleman-barrister's honor. It was not the lawyer's dignity but the client's interest that forbade disclosure of anything communicated between the two, and the inevitable inference was that since the client was the best judge of his interest, he might permit such a disclosure."

These are clear expositions of the reasons underlying why we have and giving justification for the attorney-client privilege.

How far does the privilege extend? A number of cases are cited in footnote 5 to § 2318 on pages 625-627 of Volume 8, Wigmore. They discuss when the privilege is applicable and when it is not. There is no consistency in the rulings or reasoning adopted. Because of such divergencies it was thought desirable to get at the reasons

for the rule.

Should it be extended to a case like that presented here, where the appraiser was consulted by the attorney and based on his knowledge acquired as an expert appraiser and in consultation with counsel, where the appraiser gave advice to the attorney in matters relating to counsel's preparation for the trial of the case?

Certain factors must be given some weight in an overall consideration of the propriety—the ethical phase—on the part of a person, who has been included in the compass of an adviser for an attorney engaged in the preparation of a case for trial, and who has taken part in discussions had in preparation of the case for trial, and thereafter announces he intends to appear as an expert witness for the opposition. I find it impossible to distinguish the situation of an appraiser from that of the physician, who played such an important part in *City and County of San Francisco v. Superior Court,* supra.

For instance, in *Hickey v. United States,* 18 F.R.D. 88, 89, (U.S.D.Ct., E.D. Penna. 1952) now Circuit Judge Ganey of the Court of Appeals, Third Circuit, recognized what I conceive to be the ethical duty of a real estate appraiser who had been "employed by one of the parties" taking compensation from the other. Judge Ganey said of such an appraiser, who refused to take compensation that he ought not to be "ordered to testify".

There is some analogy between such an appraiser, a physician or other type of expert and an attorney. Should attorneys testify in a case?

The discussion, appearing in Jones, Commentaries on Evidence, 2d Ed., Vol. 5, § 2154, especially at page 4082, regarding attorneys taking the stand and testifying in a case, is quite apposite here; it deserves consideration in

the determination of the question presented in this situation. It is stated there that "The practice of an attorney testifying [in a case in which he is involved] is * * * universally frowned upon". The Supreme Court of Pennsylvania characterized a lawyer's testifying in a case as "a highly indecent practice". See *Frear v. Drinker*, 8 Pa. 520, 521 (1848). The Delaware Courts have long frowned on a lawyer's testifying in a case which he is trying. In *Wallace v. Wilmington & N. R. Co.*, 8 Houst. 529, 18 A. 818 (Super.Ct.1889), this Court declined to permit a law student, who had aided in the preparation of a case for trial, to testify in such case on the ground "that it is contrary to public policy". The same rule was applied in *Doe ex dem. Pritchard v. Henderson*, 3 Penn. 128, 1434, 50 A. 217 (Super.Ct.1901). The case involved a son, also a lawyer, of the lawyer conducting the trial testifying therein. The Court said "The Court will not draw any very nice lines where a person is in the office of one of the counsel in the case * * *."

Our Courts have permitted lawyers to testify on formal matters, see *Crooks v. Purnell*, 4 Houst. 305, Super.Ct. 1872 (to prove demand and refusal to pay money allegedly due); *Hollis v. Vandegrift*, 5 Houst. 521 (1879) (a fact learned independently of relationship of attorney and client); *Real Estate Trust Co. v. Wilmington & N. C. Electric Ry. Co.*, 77 A. 756 (Del.Ch., 1910) (to prove an admission by adverse party); and *Gray v. Pennsylvania R. R. Co.*, 3 W.W.Harr. 450, 139 A. 66 (Super.Ct., 1927), but the attorney in that case was not permitted to testify in contradiction of the testimony of another witness; see also *Nye Odorless Incinerator Corp. v. Felton*, 5 W.W.Harr. 236, 162 A. 504 (Super.Ct.1932) where the Superior Court discusses what testimony of an attorney can and cannot be received.

Thus, it appears that the Bench of this State have never given unreserved approval to lawyers testifying in a case in which they have been engaged, except on formal matters. This rule has been based on matters of "public policy" and I can see no substantial distinction between a lawyer's testifying and an expert appraiser, such as the witness here, testifying on matters discussed with counsel, if he has been theretofore engaged by the opposition and participated in preparation for the trial, giving advice, such as is the situation here presented. To me the same concept of "public policy" would and should apply.

It must be recognized that preparation and trial of a condemnation case for trial involves the advices of experts, such as appraisers; it has been said that "the evidence nearly all comes from expert witnesses", see *Lewis v. United Air Lines Transport Corporation*, 32 F.Supp. 21, 23 (W.D.Pa.1940).

The need for using experts to guide an attorney in the conduct of a complicated case, such as a patent case was recognized in *Lalance & Grosjean Mfg. Co. v. Haberman Mfg.*, 87 F. 563, 564 (S.D.N.Y. 1898) and the availability of such an expert as a witness was discussed. The Court there indicated if the expert occupied a position solely as guide of counsel, the client could invoke the privilege; it being otherwise "when the expert ceases to act as counsel, and allows himself to be made a witness; at least, to the extent to which he testifies". I think such a rule has merit and is applicable here.

The witness here, together with other experts, had been utilized by the attorney for the plaintiff in the preparation and presentation of his case. and I think he thereby has assumed a relationship to the plaintiff's lawyer that has caused some courts to characterize such experts as "assistant counsel", see Lalance case, supra. I

quite agree that if the State produces him and he testifies, then, of course, the defendants would have had full range, in cross examination,—or by even calling him as their witness, if needs be—to make inquiry of the witness on all relevant matters, since any privilege would have been waived. Because the State sees fit not to call such expert to testify that should not be reason to give the opposition the right to call him as a witness for the opposition. Compare *Brink v. Multnomah County*, 224 Or. 507, 356 P.2d 536 (1960) and *Oceanside Union School District v. Superior Court*, 58 Cal. 2d 180, 23 Cal. Rptr. 375, 373 P.2d 439, 445 (1962) ; and see Lalance case, supra, p. 811.

Candor requires me to state that I would look with askance—a jaundiced eye—and with much doubt on the testimony of an expert—whoever he may be, doctor, engineer or real estate appraiser, regardless of the kind of expertise he appears to have, who, having once been employed and paid as an expert by one party to litigation and who has been engaged in preparing a case for trial, thereafter turns up in the case as the expert witness for the adversary. This would be the kind of disloyalty that prompted recognition of the privilege of attorney-client, see Radin, 16 Calif.L.R. 487, supra, p. 808 et seq.

I would not, of course, apply this line of thinking to an expert who has been only consulted to determine if he has the qualifications and "know-how" to be engaged or if it was satisfactorily shown the expert could not honestly give an opinion or advice such as a party wanted, and then was not engaged; on either or both grounds this would present entirely different situations altogether and neither is involved here.

Here, however, the witness in this case had been employed and assumedly paid by the State as an expert for over a period of several years to gather information utiliz-

ed by counsel in preparation for trial, and he had participated in conferences with and seemingly advised the attorney for the State in connection with trial matters. Then, without explanation he appeared at the trial of the case, without having been subpoenaed, and was called to testify by the defendant landowners in their behalf. This, in my judgment, raises serious questions of ethical considerations; to say the least it practically invited challenge of his duty of loyalty.

The Use of an Adverse Party's Expert Information, is the subject of a Law Review article, appearing in 14 Stanford Law Review, pages 455-458. The learned author considers the problem generally under two pertinent headings: I—The Attorney-Client Privilege (pages 455-469) and III—Fairness (pages 479-488):

His conclusion is most interesting:

"* * * If such discovery is to be denied, it should be done on the ground that disclosure would be unfair under the particular facts of the case. Blanket refusals to require information to be divulged are improper, and, at the very least, discovery should be permitted when good cause can be shown. Whether or not the unfairness objection should itself be eliminated, so that expert information would be treated just like any other, is still to be determined. * * *."

A careful reading of *Ramacorti v. Boston Redevelopment Authority*, 341 Mass. 377, 170 N.E.2d 323, 325 (1960), tends to possibly indicate that the Trial Court had excluded the evidence of value sought of the adversary's expert appraiser on the basis of "fairness". It is to be noted that the Massachusetts Supreme Judicial Court sustained the Trial Court on a holding of exercise of discretion in receiving or rejecting the evidence. See also the conclu-

sions of the author who prepared the note, touching on the subject and which appeared in 88 U. of Penn.L.Rev. 467, at page 472. See also the article, The Attorney-Client Privilege As Applied to Corporations, in 65 Yale L.J., pages 953-990, especially that portion of the author's conclusions, appearing on page 990, where he points to the "* * * difficulties * * * [in] experiences in applying the ethics of that personal relationship to expanded notions of legal services * * *." See also Developments in the Law—Discovery—74 Har.L.R., pages 940-1072, especially pages 1009-1010 and 1031, considering privileged matters.

In at least one instance, i.e. *T. C. Theatre Corp. v. Warner Bros. Pictures,* 113 F.Supp. 265 (S.Dist.N.Y.1953) a Court has enjoined an attorney who had previously represented one party to the suit in a matter relating to the suit from appearing for and representing another party since he could have made use of the information he had acquired as attorney in the prior suit. How does this differ from what the witness might have done in this case?

Judge Rodney ruled in *Wise v. Western Union Telegraph Co.,* 6 W.W.Harr. 456, 178 A. 640, that the common law rule of the attorney-client privilege was part of the law of this state. Our Supreme Court has recognized the rule,—see *Grahan v. Allis-Chalmers Mfg. Co.,* Del., 188 A.2d 125, 132 (Sup.Ct.1963). The privilege recognized by Judge Rodney in the Wise case is now considered to be one of the "sound legal principles" by which trials of cases in our Courts are to be conducted.

The extent of the privilege—to whom it is applicable and to what matters and the form and methods used in making the communications—has heretofore been considered, see pages supra; see also 97 C.J.S. Witnesses § 289, pages 816-818; 58 Am.Jur. Witnesses §§ 460-504,

pages 259, 282, especially § 498 at page 279; 8 Wigmore, Chapter 82, especially §§ 2317-2318; Conrad, Modern Trial Evidence, Vol. 2, §§ 1082, et seq. and McCormick on Evidence, § 91 et seq., especially § 100. See also *Lindsay v. Lipson,* 367 Mich. 1, 116 N.W.2d 60, 62-63 (1962) *State v. Hunt,* 25 N.J. 514, 138 A.2d 1, 10 (1958).

I also find *Brink v. Multnomah County,* 224 Or. 507, 356 P.2d 536 (1960), persuasive. The case applied the privilege to a situation such as is presented in the case at bar. There, the landowner, in presenting his case, called a real estate broker who had been employed by the State to consult with the State's attorney concerning the valuation of the property involved. Although the witness had not made a complete appraisal of the property, he had formulated an opinion as to the damages caused by the taking. The Trial Court sustained the objection to testimony involving his conclusions as to the property and the production of his report. On appeal, the action of the Trial Court was affirmed unanimously by the Oregan Supreme Court, 356 P.2d 540, 541, with the Court using the following language:

"* * * Defendant's counsel stated to the trial court that Kolberg had been employed by the defendant 'to observe this property in question and to act as a consultant and adviser to me as Deputy District Attorney representing Multnomah County and in that respect has communicated with me in regard to certain data relative to this problem.' A communication made under the circumstances described by defendant's counsel would fall within the privilege extended to a client for communications with his lawyer. A communication *'by any form of agency* employed or set in motion by the client is within the privilege.' * * *" (Emphasis supplied)

The landowners argued that a lawsuit is no longer

a game of wits but a search for truth and justice in which they should be permitted to interrogate the witness in the manner attempted, but the Oregon Court replied (356 P.2d 541):

"\* \* \* Still, our judicial system is based upon adversary proceedings, and plaintiffs had the opportunity to, and undoubtedly did, present their own version of the value of the property through the testimony of their own appraisers. Plaintiffs wanted more. Despite the fact that Kolberg had informed plaintiffs and the court that he had not made an appraisal sufficient to warrant further testimony by him, still plaintiffs wanted to build their own case by forcing defendant's agent, Kolberg, to testify that he had assessed the property at a figure greater than the value for which defendant contends, and by creating an inference unfavorable to defendant by calling attention to its failure[13] to call Kolberg after employing him to examine the property. Other courts have had occasion to reflect upon the practice of attempting to prove one's case by forcing the testimony of the expert retained by the opposing party. It has been said that one litigant should not be permitted to 'make use of his opponent's preparation of his case,' and that to do so 'would penalize the diligent and place a premium on laziness.' \* \* \*"[14]

It is to be noted the Oregon Court rejected the idea that a privilege could exist between an appraiser and his client, see 356 P.2d at 539.

I would follow this ruling in the absence of a showing the appraisal had been made in contemplation or as

---

[13]See Lalance case, supra, p. 811.

[14]The reasons given by the Court do not have the appeal and logic that the privilege factors and the factor of "unfairness" or of the "ethical" phase of loyalty referred to by Radin. See 14 Stanford L.R. 479, 482, and footnote 7, supra, p. 806.

a result of litigation and if ordered by client or litigant's attorney for use by the attorney in the litigation. In the absence of statute there is no basis for such a privilege.

The Oregon Court's ruling was based on the attorney-client privilege and *City and County of San Francisco v. Superior Court,* 37 Cal.2d 227, 231 P.2d 26, 31 was cited as the persuasive precedent, see 356 P.2d at 540.

Some contention was made as to the possible "necessity" for the testimony of this witness. I have referred to this earlier. It seems sufficient to now say that the defendant-landowners have made no showing of necessity or demonstrated the need to have the testimony of this witness. They have produced and I have listened to the testimony of several other expert appraisers who have testified on the same point as covered by the offer of proof, supra, page 802, and this leads me to conclude that defendants are primarily seeking the opinion of this particular witness, instead of any facts he may possess, although his knowledge of the facts which he uses as his premise for his conclusions will undoubtedly play a part as to how sound his conclusions are, and what weight I should accord them.

I would certainly have great difficulty in extricating out of that which the witness may give by way of testimony, such information as he may have acquired while acting as an expert for the State and in being present at the conferences with counsel for the State in the course of his preparing this case for trial, from that which the witness may have acquired independently and while acting for others. Compare *Tobacco & Allied Stocks, Inc. v. Transamerica Corp.,* 16 F.R.D. 537 (1954 D.Ct.,Del.). I am less than clear as to what the witness can add to what the defendants have already shown by testimony of their

other expert witnesses. It would be only cumulative. So far as the present showing goes I cannot see how any injustice will result to defendants' cases if the privilege asserted by plaintiff is sustained.

Defendants contend that the Court should not apply the privilege because the witness has not made a claim to it. This is of no significance, see Wigmore, § 2196, Vol. 8 at page 111, where it is stated "the claim of privilege can be made solely by the person whose privilege it is. The privilege * * * is purely personal to himself"; and see Conrad, supra at § 1096. This means here that since the privilege is that of the client the State may claim it through its counsel. The fact that the witness may be a "Willing" winess is entirely inapposite; the sole question is whether the State can claim the privilege which was first made a part of our law by the Wise decision. The witness cannot be heard to either claim it or waive it. See also Wigmore, Vol. 8, § 2321, at page 629 and 97 C.J.S. Witnesses § 307.

[9] I next rule that there is no substance in or merit to the claim of the defendants that the privilege is limited to pre-trial discovery. See Wigmore, supra, where it is said § 2323, "that the privilege continues even after the end of the litigation or other occasion for legal advice and even after the death of the client." See also 97 C.J.S. Witnesses §§ 282 and 292.

Defendants have cited *Winter v. Pennsylvania R. R. Co.*, 6 Terry 108, 68 A.2d 513 (Super.Ct.1949) as supporting their position. I do not read that case as supporting defendants' positions—particularly because it does not appear in the cited case that the investigators whose reports came to the hands of defendants' attorneys, had been consulted by or had conferred with such attorney. Similarly here, if an appraiser made a report and no

more, it would be clear to me he could be examined by the adversary side on discovery as to the facts he learned while making the appraisal 1t would be a different situation if counsel had ordered the appraisal, conferred with the appraiser and the report had been discussed in connection with the preparation of a case for trial.

Defendants' contention that the privilege is applicable only to written communications and not to oral communications is equally without merit. See discussion supra at p. 807 where the California Supreme Court in *City and County of San Francisco v. Superior Court*, stated clearly that the privilege embraced both written and oral statements. See also Conrad, supra, § 1085, and I so rule.

Since I cite and rely on the decision of the California Supreme Court in *City and County of San Francisco v. Superior Court,* supra, page 807, it seems desirable that I take some note of five recent decisions by Appellate Courts of California involving instances where a party had sought to utilize the testimony of his adversary's "experts", either at discovery or at trial and there was resistance of such uses. I refer to *People ex rel. Dept. of Public Works v. Donovan,* 57 Cal.2d 346, 19 Cal Rptr. 473, 369 P.2d 1 (1962); *Oceanside Union School District v. Superior Court,* 58 Cal.2d 180, 23 Cal.Rptr. 375, 373 P.2d 439 (1962); *San Diego Professional Ass'n v. Superior Court,* 58 Cal.2d 194, 23 Cal Rptr. 384, 373 P.2d 448 (1962); *Waters v. Superior Court,* 58 Cal.2d 885, 27 Cal.Rptr. 153, 377 P.2d 265 (1962); and *Grand Lake Drive-In, Inc., v. Superior Court,* 179 Cal App.2d 122, 3 Cal. Rptr. 621, 86 A.L.R.2d 129 (1960).

It is difficult, to a great extent, to reconcile the holdings of these cases with what I consider the California Supreme Court had determined in *City and County of San Francisco v. Superior Court,* supra, particularly, 231

P.2d at p. 31, noted at length supra, p. 807. I don't propose to do so; nor do I consider it is necessary, desirable or appropriate I do so.

There are so many differences between what I will refer to as "California practice" and "Delaware practice" and the facts of the cases and the San Francisco case that it is not necessary for me to even try to reconcile the cases.

I note first that California has a statute reading:

"A public officer cannot be examined as to communications made to him in official confidence, when the public interest would suffer by the disclosure."

The California Supreme Court ruled in the Oceanside Union School District case, supra, 373 P.2d 443, that appraisers' opinions were not privileged under that statute, stating "it has not been shown that the public interest would suffer by the disclosure. * * *."

It is not clear from the opinions that the appraisers had discussed their opinions with counsel or that they had taken any part in conferences with him in preparation for trial or in advising counsel, such as appears so clearly in this case, and in *City and County of San Francisco v. Superior Court,* supra, and the Brink case, supra, so that there could be any doubt as to the applicability of the principle. This absence is to be noted in practically all the decisions.

A most interesting statement is to be noted in the Oceanside Union School District case, 373 P.2d 445; it is worthy of comment. The California Supreme Court said at the cited page:

"* * * At least as to the expert's testimony we have heretofore set the matter at rest insofar as Cali-

fornia is concerned. In *People ex rel. Dept. of Public Works v. Donovan,* 57 [Cal.2d 346], 19 Cal.Rptr. 473, 369 P.2d 1, *it was held that where the condemning authority failed to call its own appraiser at the trial of a condemnation action, defendant was entitled,* in the face of an objection of privilege, *to call that appraiser as a witness and elicit from him not only the facts which he had determined, but also his opinion as to value which he had transmitted to plaintiff's attorney in confidence. Thus, in California, it has already been determined that (at the time of trial) the attorney-client privilege does not protect either the facts obtained or the mental opinions and calculations of that type of expert who, like a real estate appraiser, does not pass on to the attorney information which emanated 'from the client.'* * * *"* (Emphasis supplied)

A careful reading of the Donovan case shows that this factor was not discussed or considered in that opinion; other matters were not apposite here. Compare the Lalance case, supra at page 811. In Oceanside, the California Supreme Court said nothing which tends to show it was limiting the holding of *City and County of San Francisco v. Superior Court,* except to point out (Id.) :

"* * * *The distinction is based on the source of the expert's information, rather than on any intent or lack of intent to make the communication confidential.* The real estate appraiser who obtains his information by viewing the adversary's property, by recourse to public records of permitted land use, and from comparable sales, is not transmitting a client's 'confidence.' If the expert is not

transmitting the client's confidences[15], his communication cannot be protected by the provisions of a statute the sole purpose of which is to encourage a client to make full disclosure to his attorney without fear that others may be informed. \* \* \*" (Emphasis supplied)

Several other reasons could be given concerning the lack of persuasiveness of these cases in our situation, but I do not consider it necessary to do so. California has different rules, statutes, and practices; I must and do recognize them as differentiating the cited cases from that of *City and County of San Francisco v. Superior Court*, at the time it was decided. There is discussion and consideration in the later California cases of rules of "strict construction" and other factors which I hold are not pertinent here. It is to be noted that in most of these cases the Courts recognize the San Francisco case as still being the law in California.

In California the attorney-client privilege is based on statute while in Delaware the common law rule has been adopted. In California the Courts use a rule of strict construction of the statute, but I doubt that should be applied here, especially since our rule of privilege is that of the common law and particularly in light of the language used by former Chief Justice Southerland in *Warner Co. v. Leedom Const. Co.*, 9 Terry 58, 64, 97 A.2d 884, 887 (Sup.Ct.1953) where, in considering what rule of construction a Court was to use to determine the meaning to be given a mechanics lien statute, the learned Chief Justice said:

---

[15]I emphasize that it was not made to appear in Oceanside that the appraiser took any part in conferences with counsel involving preparation of the case for trial or in advising counsel. Compare *City and County of San Francisco v. Superior Court,* cited and discussed supra, page 807 and the Brink case, supra.

"\* \* \* We must also deprecate the tendency to construe the mechanics' lien statute with excessive strictness on the ground that the statute 'is in derogation of the common law'. This rule is of little aid to construction in modern times. \* \* \*"

I consider this philosophy of construction is equally applicable here.

Whatever may prompt the California Courts to apply the "strict construction" approach in determining what is and what is not within the attorney-client privilege statute. is, of course, a matter for their courts to determine. I do not consider such a rule of construction as applicable here inasmuch as we have adopted and follow the common law privilege of attorney-client. I do not, moreover, believe the interests of justice are furthered by saying a statute or policy of admission or rejection of evidence in trials of cases is to be determined by a rule of "strict construction" or by any other rule of construction other than one which is prompted by the dictates of "fairness", as respects all parties; considerations of possible necessity, and in the furtherance of justice.

I consider and would rule that "facts" should be produced at any and all stages of a trial, except where some rule of evidence holds otherwise.[16] I sincerely believe, however, that use of an "adversary's" opinion evidence—obtained from the adversary's experts—presents an entirely different proposition of law. I am of opinion that the statement found in *McDermott v. Manhattan Eye, Ear & Throat Hospital*, 16 A.D.2d 374, 228 N.Y.S.2d 143, 147 (1962) correctly state what I consider should be the guiding rule of law which should be followed in this jurisdiction:

---

[16]See page 806, *supra*.

"* * * An expert subpoenaed as a witness has a right to refuse to give his opinion or to answer any question connected with his experience and judgment as an expert. * * * A professional witness is [only] obligated to testify to facts within his knowledge, the same as any other witness. * * *"

Such expert's "right to refuse to give his opinion" is, in my opinion, based upon his duty of loyalty to the person employing him and permits his employer to invoke the privilege of attorney-client, if applicable, where litigation seems imminent or is pending, and his expert would appear to seek to give opinion testimony, otherwise the expert violates the duty he owes to his employer.

Until the General Assembly passes legislation abolishing the attorney-client privilege, as I have stated it here, or until the Supreme Court, by decision, determines such privilege is no longer to be utilized or it is in applicable in proceedings involving the State or any agency or subdivision thereof, I consider it should be applied where the circumstances of the case warrant it. By the same token if the circumstances do not warrant the privilege to be applied it should not be applied. I mean specifically in the eliciting of *facts*—as contrasted with "opinions" at or in connection with conferences with the attorney of the State Agency. Probably the discretion vested in the Condemnation Court, see *State v. Improved Parcel of Land*, Del. Super., 188 A.2d 513, 515-516, will and should control.

I know of no reason—and no convincing reason has been shown to exist—why the Officials of this State cannot claim the attorney-client privilege in a situation, such as has been presented and considered here. Persons who have had a confidential relationship with a then Official of a state or a subdivision or agency thereof, should not

be permitted to testify as to matters that were the subject of confidential discussions, such as has been shown in the case here, where the counsel played a part in and conferred with the witness in preparation for the trial and there were discussions and conferences centering about the very issue involved in and to be decided by the Court.

I hold that the attorney-client privilege rule, such as has been claimed and discussed, is applicable to the situation in the case and is a proper reason for this Court to sustain the objection on the State's part to the witness testifying further in the case, in behalf of defendants.